**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DAVID MARESCA, *et al.*,<br><br>*Defendants.* | Case No. 1:23-cr-123 (RDM) |

## MEMORANDUM OPINION AND ORDER

Along with three others, Defendant David Maresca is charged in a nineteen-count indictment.[1]  Dkt. 1 (Indictment).  Although the indictment includes other charges, the principal focus of the case is an alleged "scheme to defraud distressed homeowners by falsely representing that [defendants] would provide legal services that would help the homeowners save their homes," when, "[i]n truth and in fact, the defendants did not provide legal services as promised." *Id.* at 3 (Indictment ¶ 7).  The indictment alleges that Defendants carried out this scheme using two entities, first, Synergy Law LLC ("Synergy Law") and, second, Themis Law PLLC ("Themis Law"), which were purportedly D.C.-based law firms but that, according to the indictment, merely operated call centers in Manassas, Virginia, and provided no legal services. *Id.* at 4–8 (Indictment ¶ 10).  It further alleges that Defendants "generated proceeds of no less than $15 million through their false and fraudulent representations to homeowners that they would provide legal services to their victims."  *Id.* at 8 (Indictment ¶ 10x).

---

[1]  One of the three defendants, Terrylle Blackstone, has pled guilty to conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 371.  Dkt. 55.  The other two are Scott Marinelli and Sam Babbs III, both of whom have entered pleas of not guilty.

On May 6, 2021, almost two years before the grand jury returned the indictment, law enforcement officers executed search warrants at Maresca's home in Nokesville, Virginia and two office suites leased by Themis Law.  The warrants authorized the government to seize evidence of wire fraud, bankruptcy fraud, and tax evasion, among other possible offenses. During their searches, law enforcement officers seized twenty-nine digital devices, including nineteen desktops, laptops, and cell towers and ten smartphones and tablets.

Pending before the Court are three motions related to the execution of these warrants.  In the first motion, Maresca moves to suppress any evidence derived from the digital devices seized during the May 6, 2021, searches, Dkt. 133, and, in the second motion, he seeks prospective relief barring the government from continuing to review the material stored on the devices, Dkt. 154.  In the third motion, the government asks the Court to deny both of Maresca's motions in part on grounds of mootness.  Dkt. 243.

Both of Maresca's motions assert that the government has violated—and threatens to continue to violate—his Fourth Amendment rights by seizing an array of computers, smartphones, and tablets pursuant to the May 6, 2021, search warrants, and then "failing to segregate responsive" material from non-responsive material over a period of years.  Dkt. 133 at 1.  As Maresca acknowledges, the government may, at times, "seize entire electronic devices and then conduct a later off-site search of those devices."  *Id.* at 2.  But he maintains that this accepted practice does not permit the government to seize electronic devices containing both responsive and non-responsive materials and then, to wait for years before even attempting to "scope" the devices—that is, before attempting to segregate the responsive materials, which fall within the scope of the warrant, from the non-responsive materials, which do not.  *Id.*  In Maresca's view, by failing "even [to] *commence*—much less complete—its" scoping of the

relevant devices "for well over three years," the government has acted unreasonably and has, in effect, turned the targeted search warrants issued by the Magistrate Judge into "general warrant[s]" in violation of the Fourth Amendment. *Id.* (emphasis in original). The government's mootness motion, in turn, notes that it obtained a new warrant for evidence contained on nineteen of the twenty-nine devices on January 8, 2026, and argues that any use of that evidence at trial, and any future searches of the nineteen devices, is governed solely by the new warrant, Dkt. 243 at 2, which Maresca has not challenged—at least to date.

Resolving this legal question has been a challenge, not because the law is unsettled, but because the ground upon which the parties are litigating the question has continued to shift. As a result, framing the questions for decision requires a more extensive description of the relevant procedural background than is typical. But the detail is important.

Maresca first raised the undue-delay issue in his motion to suppress, which he filed over a year ago. *See* Dkt. 133. In response, the government argued that it had acted reasonably in executing the warrants, Dkt. 137 at 12, and asserted (it turns out incorrectly) that it had "been actively engaged in processing and reviewing digital evidence throughout the investigation and litigation of this case," *id.* at 17, including "to identify responsive . . . materials," *id.* at 16. As the government put it, "[t]his is not a case in which [it] waited over two years from the time it collected the data to search it," *id.* at 17, or a case in which "the government just ha[d] forgotten to actually look at the device[s] at all," Dkt. 144 at 30.

The government, however, promptly switched tacks and, rather than defend the reasonableness of its scoping of the devices, it agreed not to use in its case-in-chief any evidence recovered from the devices as to which Maresca has Fourth Amendment standing ("Maresca's devices"). *See* Dkt. 148 at 7 n.4 ("The government will not use any evidence recovered from

those forensic images in its case in chief at trial."); *id.* at 14 n.11; Dkt. 150 at 2 ("[T]he government has informed the defendant that it will not use evidence from twenty devices seized from Mr. Maresca's personal office space and residence in its case-in-chief at trial against Mr. Maresca."); *id.* at 1 (citing Dkt. 148 at 7 n.4). This took the question of the government's compliance with the Fourth Amendment off the table for purposes of Maresca's motion to suppress; the sole question for resolution was whether Maresca has standing with respect to each of the disputed devices. Consistent with that charge, the Court directed that the parties submit evidence regarding Maresca's standing, and it held two evidentiary hearings on that question of fact, *see* Min. Entry (June 26, 2025); Min. Entry (Sept. 24, 2025), and, after that, permitted the parties to file supplemental declarations, Dkts. 192, 194. The Court heard argument on Maresca's suppression motion on September 29, 2025.

The government's efforts to narrow the dispute to one of standing did not put the issue of unreasonable delay to rest, however. On April 25, 2025, even before the Court held the first evidentiary hearing on the question of standing, *see* Min. Entry (June 26, 2025), Maresca filed the second motion now before the Court, which seeks an order "prohibit[ing] the government from continuing to search the seized devices," regardless of the use (including impeachment) that the government might make of what it finds. Dkt. 154 at 7. This motion picks up where Maresca's motion to suppress leaves off and argues that the government's undertaking not to use certain evidence in its case-in-chief helps but does not suffice; simply put, "[a]lthough the government's use of a suppressed document outside of its case in chief might be permissible in spite of a *past* Fourth Amendment violation, this i[n] no way authorizes the government to commit a *future or continuing* Fourth Amendment violation." Dkt. 154 at 4 (emphasis in original).

Among other arguments raised in response, the government (at least at first) maintained that no violation had occurred because the "'relevancy review'" could not occur until "*after* the filter team remove[d] any privileged materials," Dkt. 169 at 3 n.3 (emphasis in original), and input from "defense counsel" in the privilege review "necessarily extended the time required to complete the filter review," *id.* at 4.  The government also maintained that it had made substantial progress in scoping the devices.  As late as October 31, 2025, for example, the government represented that "the filter team [had] cleared 19 of the 29 seized digital devices" and that the case agent had "scoped"—that is, "ran date limitations and relevancy terms"—on the non-privileged records found on the 19 devices that had cleared the privilege review process.  Dkt. 202 at 17.  According to the government, the "scoping" of those devices "was completed by February 14, 2025." *Id.*

Maresca, nevertheless, continued to press for a factual hearing on his motion for prospective relief.  Dkt. 204 at 3–4; Dkt. 212.  After the Court ordered the government to respond to Maresca's request for a hearing, *see* Min. Order (Nov. 12, 2025), the government informed the Court that its previous representation that Special Agent Melissa Lawrence had scoped 19 of the 29 devices was incorrect.  Dkt. 216 at 4.  In reality, Agent Lawrence had only scoped a small subset of the non-privileged materials on those 19 devices.  *Id.*  Presumably to give the Court time to determine the effect of this revelation on Maresca's pending Fourth Amendment motions, the government represented—without prompting by Maresca or the Court—that it "[would] not conduct any further search of the forensic images without further direction from the Court." *Id.* at 5.  In light of these developments, the Court agreed with Maresca that a hearing was warranted.  *See* Notice of Hr'g (Nov. 20, 2025).

5

At the hearing, it became apparent that the government had committed multiple errors in scoping (or failing to scope) the devices. To start, Agent Lawrence testified at the hearing that "back in 2021, when the 29 devices were given to" an FBI Computer Analysis Response Team ("CART") examiner, she "believed that he was going to run relevancy terms against the entire universe of data," before running "privilege terms against it." Dkt. 232 at 15. That understanding is in some tension with the government's earlier contention that the relevance review could not begin until after the privilege review was completed. In any event, however, Agent Lawrence learned in 2024 "that there was no indication" that the relevance terms were ever run or "that the data was ever segregated into those buckets." *Id.* After learning of that mistake, and after being "informed that 19 of the 29 devices had [assertedly] made it over the filter wall," Agent Lawrence ran the relevance terms and date/time filters "against the data" and "believe[d]" that she had "finish[ed] this scoping process" as to the nineteen devices by "the . . . middle of February." *Id.* at 27. That, too, was a mistake. In fact, Agent Lawrence reviewed (or re-reviewed) only "17 file extensions that" the FBI had released to the prosecution team back in 2022 and that contained only financial and tax records. *Id.* at 17; *see id*. at 27. In short, the vast majority of the relevant material was never scoped.

After hearing the evidence, the Court asked how the parties wanted to proceed in light of the "evolving" facts. *Id.* at 78–79. Maresca's counsel, understandably, requested an opportunity to review the transcript—and the revelations contained in it—before presenting oral argument. *Id.* at 79. Counsel for the government also requested argument. *Id.* at 80. Notably, in addressing timing, counsel for the government reminded the Court that "[t]he government did in its latest filing agree to stop [searching the seized devices] until there is a ruling from the Court."

*Id.* That representation was, of course, material in light of Maresca's contention that any future review of the electronic records would violate his Fourth Amendment rights.

The relevant facts continued to evolve. When the parties appeared for oral argument on Maresca's motion for prospective relief on January 2, 2026, the Court observed that the government clearly "goofed in a substantial way" by not scoping the devices in a timely manner, and, as a result, the Court focused the parties on the question of remedy, particularly given the government's "conce[ssion]" that it would "not use anything that is at issue in its case in chief." Dkt. 237 at 82; *see* Min. Order (Dec. 31, 2025). Among other things, the Court asked both Maresca's counsel and counsel for the government whether the government could, "at this point," apply for "another warrant." *Id.* at 84. As one might expect, Maresca's counsel argued that it was too late to cure any ongoing Fourth Amendment violation, *id.* at 84–93, while counsel for the government argued "that it could seek . . . a new warrant in this case," *id.* at 107–08.

Separately, defense counsel also requested an opportunity to move to quash, should the Court allow the government to seek a new warrant. *Id.* at 118–19. That request found some support in a recent decision from this Court, *see Richman v. United States*, 350 F.R.D. 401, 405, 424 (D.D.C. 2025). And, unlike the typical case where *ex parte* proceedings are necessary, providing notice to the defense in this case would pose no risk of evidence tampering or spoliation, since the forensic images at issue were and remain in the government's possession. Dkt. 237 at 118. Just moments prior to this discussion, moreover, government counsel reiterated that it "has taken responsibility in the sense that the government is not going to use the materials in its case in chief" and that it "has already self-regulated and . . . [is] not going to benefit from any delay." *Id.* at 106–07. In other words, "[t]he government will only use nine of the devices for which [it does not] believe the defendant has standing." *Id.* at 107.

At this point, all that was left was for the Court to issue its decision, or so the Court thought.  Unbeknownst to the presiding judge or Defendants, however, the government applied to a magistrate judge of this same Court for a new search warrant on January 8, 2026, less than a week after oral argument.  *See* Application and Affidavit for Search/Seizure Warrant under Rule 41, *United States v. Two Hard Drives Containing Digital Device Forensic Images, Located in Washington, D.C., Under Rule 41*, No. 26-sw-01 (D.D.C. Jan. 8, 2026), ECF No. 1.  In addition, and more troublingly, despite the government's repeated representations that it would not search the devices at issue until after the Court issued its decision, the government promptly began "conducting searches" of the nineteen devices covered by the new warrant "to identify materials within the scope of those warrants."  Dkt. 243 at 2.  Based on this asserted *fait accompli*, the government then asked the Court to deny both Maresca's motion to suppress and his motion for prospective relief with respect to the nineteen devices on grounds of mootness.  *Id.* at 3.  The government waited twelve days from the issuance of the new warrant before informing the Court or defense counsel, *see id.*, and it searched two of the devices during that interval, Dkt. 266 at 1–2.  That, in turn, raises a host of additional problems, including the concern that the government might now have an obligation under *Brady* and its progeny to disclose to the other Defendants (Marinelli and Babbs) any potentially exculpatory material that it found on Maresca's devices.[2]

Later that same day, Maresca filed an emergency motion for an order prohibiting the government from continuing its search of the nineteen devices until after the Court resolves the pending motions, Dkt. 246 at 4, and, early the next morning, the Court ordered the government

---

[2]  Marinelli and Babbs had previously agreed to waive any *Brady* rights with respect to the unscoped and unsearched devices.  Dkt. 237 at 119 (Babbs); Dkt. 238 at 1(Marinelli).  But now that the government has reviewed portions of the contents of the nineteen devices, they no longer waive their rights "to assert *Brady* claims with respect to any of those devices."  Dkt. 254 at 2 (Marinelli); *see also* Dkt. 256 at 1 (Babbs).

immediately to "cease searching the seized devices" pending further order of the Court, and the

Court set an emergency motions hearing for later that day, Min. Order (Jan. 21, 2026).  At the

hearing, the Court extended its order and directed that the government refrain (as it had

previously represented that it would) from reviewing the material contained on any of the seized

devices (including both the nineteen devices subject to the January 2026, search warrant and the

other ten devices) pending the Court's decision on Maresca's motion for prospective relief.  Min.

Order (Jan. 22, 2026).  The Court, then, set a schedule for Maresca to respond to the

government's mootness arguments and for the government to file a reply.  *Id.*

In his response, Maresca urged the Court to reject the government's mootness motion and

to resolve both of his pending Fourth Amendment motions on the merits.  Dkt. 258 at 1.  With

respect to his motion for prospective relief, Maresca argued that the constitutional defect in the

government's search warrant execution process was its prolonged and "unjustified possession of

[Maresca's] underlying private data."  *Id*. at 4.  In Maresca's view, it would "gut" the relevant

Fourth Amendment protection to permit the government to cure "a delay-based constitutional

violation" by merely procuring "a duplicate warrant."  *Id.*  In addition, Maresca argued that the

government's argument that the new warrant mooted all or a portion of his motion to suppress

fails for at least two reasons.  First, the exclusionary rule is designed to deter the government

from violating a defendant's Fourth Amendment rights, and the rule would provide "no

appreciable deterrence" if "a late-obtained warrant [sufficed] to remedy this type of unreasonable

delay."  *Id.* at 6–7 (citations modified).  Second, suppression is required, in any event, given "the

government's concession not to use evidence from [Maresca's] seized devices in its case-in-

chief."  *Id.* at 8.

In what the Court can only hope is the final chapter in simply framing the issues for decision, the government clarified in its reply brief that between January 15 and January 21, Agent Lawrence completed the process of scoping two of the nineteen devices, a laptop and a desktop computer seized from Maresca's residence.  Dkt. 262 at 4.  Remarkably, the government also argued "that Maresca has *never* claimed that his motion for prospective relief applied to the nineteen" devices subject to the new warrant, *id.* at 6 (emphasis added), even though (1) Maresca's motion seeks relief with respect to all "twenty-nine devices" seized "from [his] office and residence," Dkt. 154 at 1; *see id.* at 1 n.4; (2) neither the Court nor Maresca ever excluded any unscoped devices from the motion;[3] and (3) the government's own motion is premised on the contention that the new warrant had the effect of partially mooting Maresca's motion for prospective relief as to *those* nineteen devices, Dkt. 243 at 2.  Finally, the government barely made mention of its failure to abide by its commitment not to search any of the devices

---

[3] Maresca's position has always been that "for any devices that the government has completed scoping already, they are free to look at the relevant materials they have segregated from those devices."  Dkt. 174 at 11; *see* Dkt. 154 at 1 n.1; Dkt. 232 at 89–90.  He did not, by relying on the government's mistaken representation that nineteen devices had been scoped, waive his objection to the future search of any unscoped devices.

Nor does the government's contention that the Court held that Maresca's prospective relief motion was limited to the ten remaining devices, Dkt. 262 at 6, survive even a cursory review of the record.  The Court merely observed at the commencement of the December 3, 2025, hearing that Maresca had requested "an order barring the government from further reviewing . . . ten devices." Dkt. 232 at 5.  But the Court qualified its observation by noting that "we'll see how things develop today and whether that, in fact, is the correct scope of what we are talking about." *Id.*  After Agent Lawrence confirmed that she had inadvertently failed to scope the nineteen devices that cleared the filter wall in January 2025, the Court asked Maresca to clarify which devices were covered by his motion for prospective relief.  Maresca clarified that he was seeking prospective relief as to all twenty-nine devices, since none of those devices had been properly scoped. *Id.* at 89–90.  He also clarified that any previous representations that his motion was limited to the ten cellphones and tablets were based on the government's prior representation that those were the only devices yet to be scoped. *Id.* at 89.  That representation was consistent with the Court's prior understanding of Maresca's position, and the government did not raise any objection about the scope of the motion for prospective relief. *See id.* at 90.

before the Court resolved the pending motions, merely suggesting in a footnote (without actually saying so and without citing any support) that its commitment was limited to searches conducted pursuant to the May 6, 2021, warrants, Dkt. 262 at 10 n.10.  Although Maresca filed a sur-reply addressing these arguments, Dkt. 265, he did not introduce any new issues in that brief.

Against this shifting backdrop, the Court identifies the following issues for resolution:

First, the Court must resolve Maresca's motion to suppress.  For the reasons explained below, the Court will preclude the government from using in its case-in-chief any evidence found on the devices for which Maresca has Fourth Amendment standing.  Those devices include all fifteen electronic devices seized pursuant to the Residence Warrant and two computers, one user profile, and three smartphones seized pursuant to the Office Warrant. Because the government offers no sound reason to repudiate its commitment not to use evidence found on Maresca's devices in its case-in-chief, and because permitting the government to retract that commitment at this late date would interfere with the efficient and just administration of justice, and would pose further Fourth Amendment challenges, the Court rejects the government's efforts to moot Maresca's suppression motion by obtaining a new warrant.  Given this disposition, the Court concludes that the recently obtained warrant does not moot Maresca's motion to suppress.

Second, the Court must resolve Maresca's motion for prospective relief, which requests an order barring the government from conducting any additional searches of any of the seized devices.  The Court agrees with Maresca that the government's delayed execution of the May 2021 search warrants violates the Fourth Amendment and that—for at least some of the devices—that violation is ongoing.  Even so, Maresca is not entitled to an order barring the

11

government from ever again searching the seized devices. Such relief would be both unprecedented and unnecessary to remedy the violation of Maresca's Fourth Amendment rights.

That conclusion does not wholly resolve the availability of prospective relief, although the Court must limit any relief to those devices as to which Maresca has Fourth Amendment standing. As the Court will explain, Maresca's lack of Fourth Amendment standing excludes eight electronic devices from the scope of the motion. The remaining twenty-one devices, in turn, fall into two buckets: Ten of those devices were not covered by the recently obtained warrant, and eleven were. As to the ten devices that were not covered, because the government's ongoing seizure of non-responsive records obtained pursuant to the May 2021 search warrants is unreasonable, the Court will order the government to eliminate its access to devices on which such records are stored unless and until it procures a new, valid search warrant.

As to the eleven remaining devices covered by the new search warrant, the Court is persuaded that the new search warrant does moot Maresca's motion for prospective relief and will grant the government's mootness motion in this limited respect. In reaching that conclusion, the Court stresses that it will, for the reasons noted above, preclude the government from using any evidence found on those devices in its case-in-chief and that, as a result, the deterrent purpose of the exclusionary rule will still be served. But beyond that interest in deterrence, Maresca has failed to identify any reason why an otherwise valid warrant should be rendered unenforceable in this context. The interests of justice require that the Court both effectuate the deterrent purpose of the exclusionary rule and, to the extent consistent with the Fourth Amendment, protect the truth-seeking function of the investigative and adjudicative processes.

The Court will, accordingly, **GRANT** in part and **DENY** in part Maresca's motion to suppress, Dkt. 133, **GRANT** in part and **DENY** in part his motion for prospective relief, Dkt.

154, and **GRANT** in part and **DENY** in part the government's motion to deny Maresca's Fourth Amendment motions in part on grounds of mootness, Dkt. 243.

## I. BACKGROUND

On May 4, 2021, the government applied for warrants to search two locations: (1) the office suites leased by Themis Law, located in Manassas, Virginia; and (2) the Virginia residence of Defendant David Maresca, located in Nokesville, Virginia. Dkt. 76-1 at 2 (Search Warrant Affidavit ¶ 1). The government submitted one affidavit to support both searches. *See id.* That same day, Magistrate Judge Michael S. Nachmanoff of the Eastern District of Virginia issued two search warrants, one for the office suites (the "Office Warrant"), Dkt. 76-2 at 1, and one for Maresca's residence (the "Residence Warrant"), Dkt. 71-1 at 1. Both warrants included an "Attachment A" describing the property to be searched, *id.* at 2 (Residence Warrant); Dkt. 76-2 at 4 (Office Warrant), and an "Attachment B" describing the property to be seized, Dkt. 71-1 at 6 (Residence Warrant); Dkt. 76-2 at 7 (Office Warrant). Attachment B of both warrants authorized the seizure of "documents, records, and property . . . relating to violations of 18 U.S.C. §§ 343 (wire fraud) and 1957 (transactions with proceeds of crime); 18 U.S.C. §§ 157 (bankruptcy fraud) and 1519 (obstruction of bankruptcy proceeding); 26 U.S.C. § 7201 (attempt to evade or defeat tax); and 26 U.S.C. § 7203 (willful failure to file return, supply information, or pay tax) as described in the search warrant affidavit for the time period January 1, 2016, through the present." Dkt. 71-1 at 6 (Residence Warrant); Dkt. 76-2 at 7 (Office Warrant).

Both warrants authorized the government to seize, among other things, "[c]omputers, storage media, and digital devices used as a means to commit the violations described above, or capable of creating and/or storing any of the [specified] evidentiary items." Dkt. 71-1 at 8 (Residence Warrant ¶ 18); Dkt. 76-2 at 9 (Office Warrant ¶ 18). "For any computer, storage

medium, and digital [device] whose seizure [was] otherwise authorized by [the] warrant," the search team was also authorized to seize evidence about the use, ownership, or control of the device, the presence or absence of malicious software, and other kinds of metadata that might be stored on a device.  Dkt. 71-1 at 9–10 (Residence Warrant ¶ 19); Dkt. 76-2 at 9–10 (Office Warrant ¶ 19).  The government represented in its search warrant affidavit that it would employ a two-step process to seize digital evidence, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).  Dkt. 76-1 at 43 (Search Warrant Affidavit ¶ 81(a)(i)).  The affiant explained that the search team would seize or, where appropriate, make copies of digital devices that fell within the scope of the warrant and would then transport those devices or copies to an appropriate facility for examination and forensic review.  *Id.* 43–44 (Search Warrant Affidavit ¶ 81(a)(i), (iv)).  He represented that "searching any digital evidence for . . . information, records, or evidence pursuant to this warrant . . . may take weeks or months to complete."  *Id.* at 42 (Search Warrant Affidavit ¶ 80(f)).

Both warrants also included a "filter protocol"—a safeguard designed to prevent the investigative and trial teams from seeing or using any attorney-client privileged communications, attorney work product, or otherwise privileged material.  Dkt. 71-1 at 12 (Residence Warrant); Dkt. 76-2 at 12–13 (Office Warrant); *see also* Dkt. 80 at 8–9 (citing U.S. Dep't of Just., Just. Manual § 9-13.420 (2025) (Searches of Premises of Subject Attorneys)).  When operating under a filter protocol, the government establishes a "filter team" to "independently evaluate [seized] material for the existence of privilege."  Dkt. 202 at 3.  The filter team is "not connected to the underlying investigation."  *Id.*  Law enforcement often uses a filter protocol when it executes a search warrant at the office of an attorney.  Dkt. 80 at 8.  Despite alleging that Themis Law was a sham law firm that did not provide legal advice to any of its clients, the government nonetheless

14

employed a filter protocol to reduce the possibility of a privileged document tainting the investigation. *Id.*

On May 6, 2021, law enforcement agents executed both warrants. Dkt. 137-2 at 1; Dkt. 137-4 at 1. As required by the Office Warrant, a filter team executed the search of Themis Law's office, which consisted of two suites—Suite 201 and Suite 204—connected by an internal hallway. Dkt. 176-1 at 1–2, 4. Suite 201 contained numerous private or semi-private offices, storage rooms, an open workspace with cubicles, and other shared spaces, Dkt. 148 at 7–11, and Suite 204 contained an open workspace and other shared spaces, Dkt. 148 at 55. From these suites, the filter team collected ninety-nine items of evidentiary value, some of which were physical documents and others which were digital devices. Dkt. 137-2 at 1–4. Among these items were fourteen digital devices—eleven desktops, laptops, or computer towers, which were forensically copied at the search site onto two hard drives, and three smartphones. *Id.* at 4; Dkt. 137-5.

A different team of FBI and IRS agents executed the Residence Warrant at Maresca's Nokesville home. The agents collected twenty-five physical or digital items of evidentiary value, including financial records, training manuals, and thirty boxes of client files. Dkt. 137-4. The search team also seized fifteen digital devices—two desktops, five laptops, one computer tower, four smartphones, and three tablets—for further review off-site. *Id.*; Dkt. 137-5.

**A.**

On May 6, shortly after the completion of the searches, Agent Lawrence submitted a request to the CART for the creation of duplicate forensic images of all digital media seized during the execution of the Office and Residence Warrants. Dkt. 137-5 at 3; Dkt. 137-11 at 3. At that point, the government needed to conduct a privilege review of all the seized evidence and

segregate attorney-client privileged communications or attorney work product, consistent with the warrants' filter protocols. Dkt. 232 at 12–13. And, as relevant here, it still needed to "scope" the digital devices to determine which materials fell within the scope of the warrants and could therefore be seized in accordance with Attachment B of the warrants, consistent with Rule 41(e)(2)(B). *Id.* Scoping is a "multi-step process." *Id.* at 70. It ordinarily "begin[s] with [applying] search terms and data/time filters" to narrow the dataset. *Id.* at 70–71. Then, a person needs to review that narrowed dataset for "quality control." *Id.* at 71. Both of Maresca's motions are premised on the government's failure to complete the scoping process in a reasonable amount of time.

On May 10, 2021, Agent Lawrence emailed the CART examiner assigned to this case, Warren Harvin, *id.* at 15, with a list of relevance and privilege search terms, Def. Ex. 1 at 1 (Dec. 3, 2025, Hr'g); Dkt. 232 at 30. She asked Examiner Harvin first to run the relevance search terms on the seized digital devices to create "the only dataset [the government] [would] be working with" and then to segregate "those documents . . . into two groups," one group of materials containing the privilege search terms ("potentially privileged" materials) and one group of materials without those words. Def. Ex. 1 at 1 (Dec. 3, 2025, Hr'g); Dkt. 232 at 30. She asked that the "potentially privileged" materials be uploaded to the FBI's CAIR system for review by the filter team. Def. Ex. 1 at 1 (Dec. 3, 2025, Hr'g); Dkt. 232 at 31. She also asked that the "other dataset that did not contain [privilege terms] be put on CAIR for [her] to review."[4]

---

[4] The FBI uses the CAIR system to review digital evidence. Dkt. 232 at 13. The CAIR system can only be accessed from within an FBI facility. *Id.* In the CAIR system, agents can label individual files and set up the system "so that certain people can't see those particular labels, so their access is limited." *Id.* In this case, the CART and filter teams labeled potentially privileged and privileged materials as "privileged." *Id.* Agent Lawrence cannot see files marked as "privileged" in the CAIR system, and she cannot remove the "privileged" label. *Id.* at 14.

Def. Ex. 1 at 1 (Dec. 3, 2025, Hr'g); Dkt. 232 at 31. Examiner Harvin never responded to Agent Lawrence's email, Dkt. 232 at 34, and Agent Lawrence never followed up to determine whether her May 10, 2021, tasking had been completed, *id.* at 36–38. Years later, Agent Lawrence learned that the search that she requested had never been run by Examiner Harvin. *Id.* at 35–36.

Nonetheless, by August 26, 2021, the CART finished creating duplicate forensic images of all digital media seized during the searches. Dkt. 137-5 at 3; *see also* Dkt. 202 at 4–5. The filter team then began its process of clearing seized materials, Dkt. 202 at 5–10—*i.e.*, "certif[ying] that the data was not privileged or creat[ing] a version of the data that removed any privileged material," *id.* at 7. Between June 2021 and February 2023, the filter team cleared physical evidence seized during the May 6 searches, *id.* at 7–8, digital records containing "clearly financial and non-privileged evidence"—*i.e.*, spreadsheets and tax records, *id.* at 8–9, along with other records obtained from the investigation into Themis Law and Synergy Law that were not seized during the May 2021 searches, *id.* at 10. It did not review any of the potentially privileged digital evidence obtained from the searches.

Then, on April 13, 2023, a grand jury indicted Defendants David Maresca, Scott Marinelli, Terrylle Blackstone, and Sam Babbs III for multiple offenses related to their operation of Themis Law and Synergy Law. *See* Dkt. 1. At that point, the filter team began working with defense counsel to identify potentially privileged materials stored on the devices seized pursuant to the May 2021 searches. Dkt. 202 at 10. Between July 2023 and December 2023, the filter team shared 1,800 files with Defendants and asked them to advise the government "whether [they] believe[d] that any of these materials contain attorney-client privileged or attorney work

---

Throughout the December 3, 2025, evidentiary hearing, Agent Lawrence attested that she has never had access to any materials labeled "privileged." *Id.* at 14, 18–19, 22, 24–27, 56.

product information." Dkt. 202-3 at 2; Dkt. 202 at 10–11. Then, in February 2024, the filter team produced unscoped and unfiltered master copies of the forensic images of every electronic device seized during the May 2021 searches to each Defendant. Dkt. 202-13 at 2–5; Dkt. 138-2 at 2; Dkt. 202 at 12. The filter team initially asked that the defense complete its privilege review by March 1, 2024, Dkt. 138-2 at 2, but defense counsel requested additional time, Dkt. 202-10 at 2–3 (¶ 9).

Maresca had a change of counsel, and, on March 21, 2024, his current counsel appeared in the case. *See* Dkts. 41, 42. Between May 2024 and December 2024, Maresca and Marinelli engaged in extensive correspondence and litigation with the government about (1) the accessibility of the government's discovery productions and (2) the filter protocols for the fourteen digital devices seized during the office search and the fifteen digital devices seized during the residence search. Regarding the filter protocols, the parties disputed the proper sequence of the privilege review and disagreed about which party should bear the burden of completing each stage. During this back-and-forth, government counsel did not disclose that Agent Lawrence had asked Examiner Harvin to run a list of relevance and privilege search terms in May 2021 or that she learned in June 2024 that Examiner Harvin had failed to do so. In any event, the parties eventually agreed that the filter team would search for documents that hit on both the prosecution team's relevance terms and the Defendants' privilege terms and then provide those documents to the relevant privilege holder for review by his counsel. *See* Dkt. 118 at 77–79; Dkt. 128 at 1; Dkt. 130 at 20–21, 32–34.

The filter team made its final production of relevant, potentially privileged materials to the Defendants for their review on December 20, 2024. Dkt. 135 at 5–6 (¶ 9). The privilege review process for the nineteen laptops, desktops, and computer towers concluded on January 31,

18

2025.[5] Dkt. 202 at 17.  After the government completed the privilege review, it took Agent

Lawrence two weeks (until February 14, 2025) to run the date limitations and relevance terms on

what she believed to be all the non-privileged materials.  Dkt. 232 at 27–28, 53.  She ran the

same list of relevance terms that the filter team had used to facilitate the privilege review

process.  Dkt. 232 at 70, 76–77.  Based on this work, the government represented to the Court

that the "scoping" of the nineteen devices "was completed by February 14, 2025."  Dkt. 202 at

17.

That representation was incorrect.  On November 17, 2025, the government informed the

Court that it had "learned for the first time" that Agent Lawrence had not scoped the entirety of

the nineteen devices due to a "technical access issue."  Dkt. 216 at 4.  The government promised

to "file an amended declaration by no later than December 5, 2025, correcting the record."  *Id.* at

5.  The government also represented that it would "not conduct any further search of the forensic

images without further direction from the Court."  *Id.*

At Maresca's urging, on December 3, 2025, the Court held an evidentiary hearing

regarding the privilege review and scoping processes.  Min. Entry (Dec. 3, 2025).  At that

hearing, Agent Lawrence testified that she noticed in November 2025 "that there were no PDFs,

no Word documents, [and] no emails" among the cleared material that she had reviewed.  Dkt.

232 at 27.  After following up with the CART and the filter team, Agent Lawrence determined

that she did not, in fact, have access to most of the cleared materials, *id.* at 28, and, instead, had

access only to "the 17 file extensions" associated with the financial records that the prosecution

---

[5]  Maresca's counsel stress that they have cleared only the "subset of documents that hit
on . . . the government's relevance terms."  Dkt. 250 at 21.  To the extent the government
subsequently applies different relevance terms, or to the extent the government's trial team
reviews portions of the electronic media that are not limited by the relevance review, the existing
privilege review may not suffice.

team had received years earlier, *id*. at 55–56.  Upon further inquiry, she learned that all the material from the nineteen devices that had been loaded onto the CAIR system—both privileged and nonprivileged material—was tagged "privileged," except for the seventeen file extensions. *Id.* at 28.  As a result, Agent Lawrence could "see" only the seventeen file extensions, and she failed to notice that most of the relevant materials were missing—and thus were never scoped— until November 2025.  *Id.* at 27–28.  After Agent Lawrence testified, counsel for the government told the Court that it had "agree[d] to stop [searching the devices] until there is a ruling from the Court."  *Id.* at 80.

On January 2, 2026, the Court heard oral argument on Maresca's motion for prospective relief.  Min. Entry (Jan. 2, 2026).  At that hearing, the Court expressed skepticism that the government's delay of over four years in scoping the devices was consistent with the Fourth Amendment and, against that backdrop, the Court directed the parties to focus on the question of remedy.  Dkt. 237 at 82–83; *see* Min. Order (Dec. 31, 2025).  Among other things, the Court asked the parties whether the government could obtain a new warrant, which might permit it to search the devices despite the government's failure to execute the May 6, 2021, warrants in a timely manner.  Dkt. 237 at 84.  Counsel for Maresca argued that it was too late to cure the violation, *id.* at 84–91, while counsel for the government argued that it "could" seek a new warrant, *id*. at 107.  At a bare minimum, counsel for Maresca asked that they have an opportunity to move to quash any new warrant before it was executed.  *Id.* at 118–19.  With the government's promise not to search the devices absent further order from the Court, the Court took the matter under advisement.

The government, however, did not keep that promise.  Less than a week after oral argument, and without notifying the presiding judge (or opposing counsel), the government filed

20

an application with a magistrate judge on this same Court for a new warrant for nineteen of the twenty-nine devices at issue. *See* Application and Affidavit for Search/Seizure Warrant under Rule 41, *United States v. Two Hard Drives Containing Digital Device Forensic Images, Located in Washington, D.C., Under Rule 41*, No. 26-sw-01 (D.D.C. Jan. 8, 2026), ECF No. 1. Nothing prevented the government from filing this application. But the government did not merely seek a new warrant; it began scoping the nineteen devices and waited twelve days before notifying the presiding judge or opposing counsel that it was doing so. Dkt. 243 at 2. And it did so notwithstanding its representation—both in writing and orally—that it would not search any of the devices without prior Court direction. *See* Dkt. 216 at 5; Dkt. 232 at 80.

As explained above, as soon as Maresca's counsel learned about the government's violation of its commitment not to review the devices pending the Court's decision, they moved for an order precluding the government from continuing its searches, while the Court resolves the parties' related disputes. The next morning, the Court ordered the government immediately to cease searching the devices and set a hearing on Maresca's request for emergency relief for later that day. Min. Order (Jan. 21, 2026). Then, at the hearing, the Court ordered "that the government shall not continue to scope any of the 19 seized devices covered by the January 8, 2026, search warrant . . . until the Court rules on the pending Motion for Order to Prevent Continuing Fourth Amendment Violations, Dkt. 154, and Motion to Deny Defendant David Maresca's Fourth Amendment Motions in part on Mootness Grounds, Dkt. 243, or further order from the undersigned." Min. Order (Jan. 22, 2026).

## B.

While the parties' dispute regarding the scoping of the twenty-nine devices played out, the Court considered the separate issue of Maresca's Fourth Amendment standing, which the

21

government raised as its sole defense to Maresca's motion to suppress, and which it later raised as a partial defense to Maresca's motion for prospective relief. By way of background, the government initially opposed Maresca's motion to suppress by arguing that it had acted reasonably in executing the warrants and, in particular, that it had not engaged in undue delay in scoping the materials seized pursuant to the May 2021 search warrants. Dkt. 137 at 10–17. But the government also asserted in a footnote that Maresca lacks standing to assert a Fourth Amendment claim as to at least some of the devices recovered in the May 2021 searches. *Id.* at 10 n.8.

On February 20, 2025, the Court held an initial hearing on the motion to suppress, *see* Min. Entry (Feb. 20, 2025), at which it ordered the government to file a supplemental brief addressing Maresca's Fourth Amendment standing, Dkt. 144 at 37. In its supplemental brief, Dkt. 148, the government substantially narrowed its opposition to Maresca's motion to suppress in several respects. First, the government conceded that Maresca has Fourth Amendment standing to seek suppression of evidence found on the two computers recovered from Room G of Suite 201, which the government believes was Maresca's personal office. Dkt. 148 at 7 n.4, 14 n.11. Second, it also conceded that Maresca has standing with respect to the fifteen devices recovered pursuant to the Residence Warrant. *Id.* at 7 n.4. Third, it agreed not to use any evidence recovered from those seventeen devices—the two recovered from Maresca's personal office and the fifteen recovered from his home—in its case-in-chief. *Id.*; *see also* Dkt. 150 at 2 ("the government has informed the defendant that it will not use evidence from twenty devices seized from Mr. Maresca's personal office space and residence in its case-in-chief at trial against Mr. Maresca"). Fourth, the government (implicitly) dropped its opposition with respect to the three smartphones seized pursuant to the Office Warrant and (expressly) limited its opposition to

22

Maresca's standing to seek suppression of evidence found on the nine computers seized pursuant to the Office Warrant that were located outside Maresca's personal office. Dkt. 150 at 2. In sum, then, the government agreed not to use in its case-in-chief evidence obtained from any device as to which Maresca has Fourth Amendment standing, and it has conceded that he has standing with respect to twenty of the twenty-nine devices that were seized.

In response to the government's supplemental motion, Maresca argued that as majority owner and Chief Executive Officer ("CEO") of Themis Law, he had a legitimate expectation of privacy in any device found anywhere in Themis Law's office, regardless of where it was found or who made use of the device. Dkt. 155 at 7. Maresca also argued that "it appears that [he] did use at least two" of the contested computers. *Id.* In support of that contention, Maresca offered a declaration from his counsel attesting to the results of a search for "user accounts" that included the term "maresca." Dkt. 155-3 at 2 (Sochaczevski Decl. ¶¶ 6–7).

With this narrowed focus in mind, the Court held an evidentiary hearing on June 26, 2025, *see* Min. Entry (June 26, 2025), at which the government called Special Agent Kevin Gounaud, the "search team leader" for execution of the Office Warrant in May 2021, Dkt. 179 at 7–8. Gounaud testified about the layout and features of the Themis Law office suites and the CART team's forensic analysis of the seized computers. *See id.* at 7–89. He explained that the CART Team discovered "user accounts" on each of the computers seized from the Themis Law office suites, but he acknowledged that he did not know who, in fact, used or accessed each of the nine computers at issue. *Id.* at 70–71. After hearing Gounaud's testimony, the Court concluded that the record contained insufficient evidence to determine whether, and the extent to which, Maresca has a cognizable privacy interest in each computer. *Id.* at 89–91. The Court, accordingly, held a second evidentiary hearing on July 24, 2025. *See* Min. Entry (July 24, 2025).

At the second hearing, the government called Gabriela Mancini, the CART forensic examiner who prepared the user account analysis discussed in the previous hearing.  Dkt. 188 at 12–13 (Mancini).  The defense called Mark Lyon, the lead discovery lawyer from Williams & Connolly, who prepared an analysis relied upon by Maresca in his response to the government's supplemental brief on standing.  *Id.* at 36–37, 39–40 (Lyon).  Both witnesses presented evidence about only two of the computers seized from the Themis Law office suites, corresponding to forensic images 1B152_1 and 1B152_7.  After hearing testimony from both witnesses, the Court explained that it seemed "that there is a good possibility that" the computer associated with forensic image 1B152_7 was Maresca's computer "at one point in time," but that the Court still lacked sufficient evidence about who accessed either device, whether those devices were password protected, and when either device was accessed.  *Id.* at 85–86.  The Court directed the parties to file a joint status report by July 30, 2025, indicating whether they wanted an opportunity for further briefing, evidentiary development, or argument.  *Id.* at 87–88.

In the July 30, 2025, status report, Maresca sought leave to file a supplemental declaration from Lyon with "additional information regarding when Mr. Maresca used certain devices, and whether his accounts were password-protected."  Dkt. 189 at 1.  The government, in turn, requested an opportunity to re-open Lyon's cross-examination or to file a responsive declaration from Mancini, addressing the same subject matter.  *Id.* at 2.  The Court scheduled a further motions hearing and ordered the parties to supplement the record with additional declarations, as proposed in their joint status report.  Min. Order (Aug. 2, 2025).  The parties filed their supplemental declarations in late August and early September, *see* Dkts. 192, 194, and the Court held a hearing on September 29, 2025, *see* Min. Entry (Sept. 29, 2025).  The record on the question of Fourth Amendment standing is now closed.

## C.

Twelve days after obtaining a new warrant for the nineteen devices and beginning to search those devices, the government filed a motion asking the Court to deny both of Maresca's Fourth Amendment motions in part because, according to the government, that warrant "render[s] both Defense Motions moot in most respects." Dkt. 243 at 1. Maresca opposes that motion, arguing that the new warrant cannot cure the years-long delay in searching the devices. Dkt. 258 at 3–4. He also argues that the government's motion ignores the important deterrent function of suppression and the government's commitment, in any event, not to use Maresca's devices in its case-in-chief. *Id.* at 5–8. In reply, the government maintains that it did nothing wrong and that there is no reason to limit its ability to search the nineteen devices pursuant to a presumptively valid search warrant. Dkt. 262 at 1–4.

Finally, before the government obtained the new warrant, and based on the government's representation that it had not yet—and would not absent further Court order—search the devices, Marinelli and Babbs conditionally agreed to waive their "right to assert claims pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny . . . with respect to the devices within the scope of" any order the Court might enter enjoining the government from reviewing "the electronic devices seized pursuant to the May 4, 2021 search warrants." Dkt. 238 at 1 (Marinelli); *see also* Dkt. 256 at 1 (Babbs) (referring to waiver made "at prior hearing"). In light of this background, the new warrant, and the fact that the government had begun searching at least some of the nineteen devices, the Court directed Marinelli and Babbs to file notices setting forth their positions regarding the application of *Brady* to the devices at issue, *see* Min. Order (Jan. 22, 2026), and it directed the government to identify which of the nineteen devices it had searched, *see* Min. Order (Feb. 22, 2026).

25

Both Marinelli and Babbs have now clarified their respective positions.  Based on the government's assertion that "it has already begun reviewing and scoping the nineteen devices covered by the January 8, 2026, search warrant, Mr. Marinelli" has indicated that he "does not waive his right to assert *Brady* claims with respect to any of those devices."  Dkt. 254 at 2.  Babbs takes a slightly narrower position and agrees to waive his Brady rights "[w]ith respect to the devices that have not been searched," Dkt. 256 at 1, leaving the question of which devices were actually searched for another day.[6]

*   *   *

Notwithstanding all of these twists and turns, both of Maresca's Fourth Amendment motions, Dkt. 133, Dkt 154, and the government's mootness motion, Dkt. 243, are now ripe for decision.

## II. ANALYSIS

### A.    Motion to Suppress

The Court starts with Maresca's motion to suppress and the question of standing.  As explained above, Maresca moved to suppress evidence found on the twenty-nine devices at issue on the ground that the government failed to scope the devices in a timely manner.  As Maresca argued, courts have applied the Fourth Amendment "reasonableness standard to suppress evidence when the government delayed unreasonably in sifting through [electronic media] warrant returns for relevant evidence."  *United States v. Zelaya-Veliz*, 94 F.4th 321, 338 (4th Cir. 2024); *see also United States v. Wey*, 256 F. Supp. 3d 355, 383 (S.D.N.Y. 2017); *United States v.*

---

[6] Given the importance of this question, the Court ordered that for each of the devices at issue, the government indicate whether it has run date limitations and/or relevance terms and whether, it has "engaged in any qualitative review of the stored material and if so, to what extent."  Min. Order (Feb. 12, 2026).

*Metter*, 860 F. Supp. 2d 205, 211–16 (E.D.N.Y. 2012).  Given this caselaw and the evidence that the government delayed years before even attempting to scope the devices at issue here, the government prudently decided not to oppose Maresca's motion to suppress on the merits and, instead, agreed not to use in its case-in-chief any evidence recovered from any device for which Maresca has Fourth Amendment standing.  *See* Dkt. 148 at 7 n.4, 14 n.11; Dkt. 150 at 1–2.

Framed in this manner, the Court's task was a limited one.  It was required to decide only whether Maresca had a reasonable expectation of privacy with respect to the handful of devices as to which he and the government disagreed; with respect to most of the devices, the government conceded that he has standing.  After the government obtained the new warrant in early January, however, it shifted gears and now argues that its agreement not to use this evidence in its case-in-chief no longer applies with respect to the nineteen devices covered by the new warrant.  The Court will first resolve the parties' dispute as to which devices Maresca has standing and will then turn to the question of whether the government may, at this late date, disavow its agreement not to use any evidence recovered from those devices (as well as the ten other devices) in its case in chief.

1.      *Fourth Amendment Standing*

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches" and provides that "no [w]arrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  In criminal proceedings, the exclusionary rule is the "principal judicial remedy" for a violation of the Fourth Amendment.  *Utah v. Strieff*, 579 U.S. 232, 237 (2016).  The exclusionary rule bars the government from using in its case-in-chief evidence obtained from a search that violated the defendant's Fourth Amendment rights.  *See Davis v. United States*, 564 U.S. 229, 231–32 (2011); *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015).  The exclusionary rule does

not, however, extend to evidence obtained in violation of the rights of a third party.  *United States v. Payner*, 447 U.S. 727, 734–35 (1980).

A defendant seeking to benefit from the exclusionary rule "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).  That is because "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Id.* at 133–34 (quoting *Alderman v. United States*, 349 U.S. 165, 174 (1969)).  Although the requirement that a person "have a cognizable Fourth Amendment interest in the place searched" to seek suppression is not jurisdictional, courts often refer to it by the shorthand of Fourth Amendment "standing." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018).

A person has Fourth Amendment standing to challenge an allegedly unconstitutional search if he "had a legitimate expectation of privacy in the area searched." *United States v. Salvucci*, 448 U.S. 83, 92 (1980).  To establish a "legitimate expectation of privacy," a person must demonstrate that he had a "subjective expectation of privacy" in the searched area that "society is prepared to recognize as 'reasonable.'" *Rakas*, 439 U.S. at 144 n.12 (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); *accord Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

Here, the government has conceded that Maresca has standing with respect to the "twenty devices seized from Mr. Maresca's personal office space and residence," Dkt. 150 at 2; *see also* Dkt. 148 at 7 n.4, and it disputes his standing with respect to only nine additional computers seized from the Themis Law offices.  The nine computers at issue correspond to forensic images 1B152_1, 1B152_2, 1B152_3, 1B152_6, 1B152_7, 1B152_8, 1B152_9, 1B152_10, and

28

1B153_1.  For ease of reference, the Court will refer to each computer by its corresponding forensic image number.

As explained below, the Court finds that Maresca has failed to carry his burden with respect to eight of the nine contested devices.  He has offered little or no evidence about (1) what day-to-day control or supervision he exercised with respect to the Themis Law employees, (2) who made use of which computers, (3) which computers he used and when he did so, (4) whether computers were password protected and, if so, who had access to the relevant passwords, and, more generally, (5) whether he maintained a subjective expectation of privacy in the material contained on any of the computers found outside his personal office.  The undeveloped state of the record is fatal to Maresca's asserted privacy interest in eight of the nine computers at issue.  As to forensic image 1B152_7, however, the record contains just enough evidence for the Court to find by a preponderance of the evidence that Maresca had a cognizable Fourth Amendment interest in his password-protected files on that computer.

        a.        Entire Office Premises

Maresca's principal theory is that as majority owner and CEO of Themis Law, he had a reasonable expectation of privacy in the entirety of the office suites.  He argues that "[w]hen a small business owner claims a reasonable expectation of privacy in his business premises, [c]ourts look to whether the individual had managerial control over the daily operations of the office."  Dkt. 201 at 5.  Maresca posits that he meets that standard because he was a "small business owner who was exercising daily management and control over the [Themis Law office suites]."  *Id.* at 6.  But when asked to identify evidence in the record showing that Maresca exercised "daily management and control over the [Themis Law] office suites," defense counsel identified only the following facts, which the government does not dispute: (1) Maresca signed the lease for the Themis Law office suites in his capacity as CEO of Themis, *id.* at 6;

(2) Maresca had a personal office in the office suites, *id.* at 7; (3) Maresca "worked in the office regularly," *id.* at 7, 10; and (4) Maresca used "at least some of the [office] computers," *id.* at 10. According to his counsel, Maresca's substantial ownership interest in Themis Law and the fact that the search warrant targeted Maresca further strengthen his claim to standing. *Id.* at 13–14.

"Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." *Carter*, 525 U.S. at 90. Individuals may, of course, have a "reasonable expectation of privacy against intrusions by police" in the workplace context, but, unlike the near-absolute protection afforded the home, "the great variety of work environments" requires a "case-by-case" analysis. *O'Connor v. Ortega*, 480 U.S. 709, 716, 718 (1987) (plurality op.). Consistent with this case-by-case approach, at least five circuits have held "that a corporate shareholder has a legitimate expectation of privacy in corporate property only if the shareholder demonstrates a personal expectation of privacy in the areas searched independent of his status as a shareholder." *United States v. Nagle*, 803 F.3d 167, 176–77 (3d Cir. 2015); *see United States v. SDI Future Health, Inc.*, 568 F.3d 684, 696 (9th Cir. 2009); *United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991); *Williams v. Kunze*, 806 F.2d 594, 599–600 (5th Cir. 1986); *United States v. Chuang*, 897 F.2d 646, 649–50 (2d Cir. 1990) (requiring corporate shareholder asserting a reasonable expectation of privacy to show that he had a "possessory or proprietary interest in the area searched"); *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946) ("Wh[en] a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment . . . ."). These courts conduct a wholistic analysis to determine whether a shareholder had a personal connection to the areas searched or the items seized or otherwise attempted to keep those areas and items private. *See Nagle*, 803

30

F.3d at 178; *see also United States v. Anderson*, 154 F.3d 1225, 1230–32 (10th Cir. 1998) (evaluating an employee's privacy interest in light of "all of the circumstances of the working environment and the relevant search").

Maresca acknowledges that other circuits require shareholders "to show some personal connection or some nexus to the place searched or the material seized." Dkt. 201 at 9. He contends, however, that there is an exception to that rule for small business owners who "exercise[] daily management and control" over the office premises. *Id.* Of the five circuits to address shareholder expectations of privacy, Maresca has identified (and the Court has found) only one circuit that has at least arguably endorsed the exception that he proposes. In *SDI Future Health*, the Ninth Circuit adopted the consensus position that "an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized." 568 F.3d at 698. But it, then, carved out an exception for cases involving "a small business over which an individual exercises daily management and control," *id.*, to account for its previous decision, *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005). For at least two reasons, that exception does not sweep as broadly as Maresca suggests.

First, in *SDI Future Health*, the Ninth Circuit emphasized that "ownership and management do not necessarily show a legitimate expectation of privacy" and that absent evidence that the defendants "enjoy[ed] exclusive use of the places searched—that is, the entire SDI office—[the defendants needed to] show a personal connection" to the items seized "to justify an expectation of privacy." 568 F.3d at 698 (citation modified). Because "none of the items seized were the personal property of" the defendants, "nor were they in the custody of either," the Ninth Circuit remanded the case to the district court to consider whether the

defendants "took measures, each on his or the pair's personal behalf, to keep the items private and segregated from other general business materials." *Id.* at 699.

Second, the Ninth Circuit's earlier decision in *Gonzalez* is distinguishable in an important respect—unlike the present case, *Gonzalez* addressed whether the owners of a business had Fourth Amendment standing to seek suppression of evidence obtained from wiretaps on telephone calls made from an office building that they owned.  412 F.3d at 1116.  The court merely held that the defendants had "a reasonable expectation of privacy over the on-site business conversations between their agents."  *Id.* at 1117.  Because this case involves tangible evidence stored on devices found in the Themis Law offices, rather than wiretaps, *Gonzalez* provides only limited guidance.  But even if *Gonzalez* applied in the present context, it would provide little help to Maresca.  The Ninth Circuit did not rest its decision on the defendants' ownership of a small business alone; the court also emphasized that the defendants "were corporate officers and directors who not only" owned the office building "but also exercised full access to the building [and] managerial control over [the company's] day-to-day operations."  *Id.*

Unlike the *Gonzalez* defendants, Maresca did not personally own or lease the Themis Law office suites.  Although he signed the lease for the office suites, he did so on behalf of Themis Law in his capacity as CEO.  Dkt. 155-1 at 7–8.  He therefore lacks the kind of proprietary interest in the Themis Law office that the Ninth Circuit relied upon in *Gonzalez*, 412 F.3d at 1116 (invoking Supreme Court precedent holding that "owners of the premises where an illegal wiretap occurs have standing to challenge the interception").  Nor has Maresca offered evidence that he exercised "managerial control over [the] day-to-day operations" of the Themis Law offices, *Gonzalez*, 412 F.3d at 1117, or that he had the type of "personal connection" to all nine devices at issue that would "justify an expectation of privacy," *SDI Future Health,* 568 F.3d

32

at 698; *cf. United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir. 1977) (corporate officer without independent connection to searched area or seized documents lacked standing to challenge search even though he "had access to and control of the print shop operations"). Maresca's reliance on Ninth Circuit precedent to support his sweeping claim of Fourth Amendment standing with respect to all devices seized pursuant to the Office Warrant is, therefore, unavailing.[7]

Maresca also cites one district court case, *United States v. Schampers*, No. 22-CR-30, 2023 WL 3324925 (E.D. Wis. Feb. 1, 2023), to support his argument that the co-owner of a business has a legitimate expectation of privacy in the entire office premises. *Schampers*, in turn, cites *Gonzalez* and *SDI Future Health* for the legal standard governing workplace expectations of privacy beyond an employee's personal office. *Id.* at *8. *Schampers* is unavailing for the same reason as *Gonzalez*: Maresca has not shown that he is similarly situated to the *Schampers* defendants who were found to have a privacy interest in the searched property.

In *Schampers*, the district court found that two co-owners had a reasonable expectation of privacy in their business's headquarters, which they "treated as a second home." *Id.* at *10. It credited the defendants' characterization of their business as a "family style and family run business." *Id.* As in *Gonzalez*, the business was small; although it "employed approximately

---

[7] Maresca also suggests that the fact that the Office Warrant was directed at finding evidence of his conduct strengthens his asserted privacy interest. The "target" theory of Fourth Amendment standing is outdated and inconsistent with elementary Fourth Amendment principles. Although some older cases consider targeting to be relevant to the Fourth Amendment standing inquiry, *see, e.g.*, *Henzel v. United States*, 296 F.2d 650, 653 (5th Cir. 1961), those cases tend to predate the Supreme Court's many decisions requiring the proponent of a motion to suppress to show that he is not only the target, but the victim, of an unlawful search and seizure, *e.g.*, *Rakas*, 439 U.S. at 130 n.1; *see Cella*, 568 F.2d at 1280–81 (rejecting the "target" theory of Fourth Amendment standing as based on dicta and "inconsistent" with the "primary tenet of constitutional law that the rights protected by the Fourth Amendment are personal rights").

thirty to thirty-five people," "no more than twelve to fifteen employees regularly worked at the Summit premises." *Id.* One of the defendants testified that he spent at least 12 hours at the office every day of the week. *Id.* Both testified that their wives worked at Summit, that they frequently brought their children to work, and that they stored a significant amount of personal property at the headquarters. *Id.* The defendants were also "the only two people with keys to the exterior of the building, keys to the interior offices, access to every room in the premises, and who could exercise control of the entire premises." *Id.* at *11. In addition, the court found it "important[]" that at least one of the defendants helped create files that were stored in the room where "most of the relevant information seized was found." *Id.*

In contrast, Maresca has offered no evidence that he was "active in the daily goings on of the business" or that he "had daily contact with the areas searched beyond [his] individual offices." *Id.* He has not shown that he is similarly situated to the *Schampers* defendants with respect to his access to, use of, or control over the Themis Law office suites and the devices at issue or that he otherwise had a legitimate expectation of privacy in all nine devices found outside his personal office. Moreover, as discussed further below, he has failed to show that he was involved in the creation of files stored on at least seven of the office computers.[8]

---

[8] Maresca also cites *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), and *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012), to support his asserted privacy interest in the entirety of the Themis Law office premises. In *Wey*, the court merely acknowledged that the parties did not dispute the defendant's standing to challenge the search of his business's office, *see* 256 F. Supp. 3d at 379 n.4, and in *Metter*, neither the court nor the parties mentioned Fourth Amendment standing at all. Because Fourth Amendment standing is an element of substantive Fourth Amendment law, not a jurisdictional requirement, the government may waive its right to challenge the defendant's standing and require him to put forth evidence of his personal privacy interest. *See Byrd*, 584 U.S. at 410–11; *United States v. Sheffield*, 832 F.3d 296, 303–04 (D.C. Cir. 2016). The fact that the government has chosen to waive the issue of Fourth Amendment standing in other cases, however, does not help Maresca meet his burden of proof in this proceeding.

The Court can infer that Maresca's position as CEO gave him policy-setting authority over Themis Law and can infer from the fact that he had a personal office and related equipment in one of the suites that he was at times present. But beyond those limited inferences, the record is bare. Because it is not enough to show that Maresca was a majority (but not sole) owner of Themis Law, that he was CEO of the business, and that he had an office and was at times present at the Themis Law suites, the Court is unpersuaded by Maresca's contention that he has Fourth Amendment standing to seek suppression of any and all evidence—including all computers—seized pursuant to the Office Warrant.

b.        Specific Computers

Having rejected Maresca's office-wide assertion of Fourth Amendment standing, the Court must determine whether he has carried his burden of showing that he had a reasonable expectation of privacy in any of the specific areas searched or computers seized. In the words of the Third Circuit, the question is whether Maresca has shown that he had "a personal connection to the place searched or to the item seized and that he attempted to keep the place and item private." *Nagle*, 803 F.3d at 178.

As an initial matter, the Court finds that Maresca has failed to show that he had a "personal connection" to at least seven of the office computers: forensic images 1B152_2, 1B152_3, 1B152_6, 1B152_8, 1B152_9, 1B152_10, and 1B153_1. These computers were found in a variety of locations throughout both Themis Law office suites, including two communal workspaces with multiple cubicles, a vacant room labeled "Synergy Staffing," an office labeled "Human Resources," and a closet adjacent to a storage room. Dkt. 148 at 15. Maresca has not shown that he had a personal connection to any of the areas where these seven computers were found. Nothing in the record indicates that Maresca spent any time in those spaces, let alone enough time to develop a reasonable expectation of privacy.

35

Nor has Maresca submitted any evidence showing that he had a personal connection to any of these seven computers. For one of the computers, forensic image 1B152_10, he makes no argument at all. As for the other six, he relies on the fact that the government found Windows user profiles starting with "SAS" on each. Dkt. 176-1 at 13. According to Maresca, those user profiles "appear to relate to [his] sole proprietorship, Synergy Attorney Services." Dkt. 155 at 2; Dkt. 201 at 18–19; *see also* Dkt. 76-1 at 3 (Valdini Aff. ¶ 8). It is plausible that the "SAS" user profiles were at some point used in connection with Synergy Attorney Services, but nothing in the record supports that contention. Regardless, the possibility that the "SAS" user profiles were associated with Maresca's sole proprietorship at some point does not help Maresca establish that he had a reasonable expectation of privacy in the records or user activity stored on the "SAS" profiles.

Fourth Amendment rights are personal and may not be asserted vicariously, *Rakas*, 439 U.S. at 133–34—on behalf of either other persons or corporate entities, which are legally separate and distinct from their shareholders, *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008). *See Nagle*, 803 F.3d at 177 ("[A] reasonable expectation of privacy does not arise *ex officio*, but must be established with respect to the person in question." (quoting *SDI Future Health*, 568 F.3d at 696)). Accordingly, even a sole proprietor may not challenge a search of property maintained by the sole proprietorship unless he has a personal privacy interest in the searched area or seized items. *Compare Mohney*, 949 F.2d at 1404 (sole shareholder could not "have a reasonable expectation of privacy in documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit"), *and Williams*, 806 F.2d at 599 (sole shareholder "had no reasonable expectation of privacy in corporate records maintained in a common file room"), *with Henzel v. United States*, 296 F.2d 650, 653 (sole

shareholder had Fourth Amendment standing where he "prepared much of the material seized, and this material was kept in his office along with some of his personal belongings").  Maresca has failed to offer any evidence indicating that he has an existing personal privacy interest in the "SAS" user profiles.  He does not claim to have created or to have protected the "SAS" user profiles or the user activity and records stored therein.  Because Maresca has offered no evidence supporting a personal connection to the "SAS" user profiles and any related content, the existence of those profiles cannot sustain a finding that he had a reasonable expectation of privacy in forensic images 1B152_2, 1B152_3, 1B152_6, 1B152_8, 1B152_9, 1B152_10, and 1B153_1.

But even if Maresca might have had a reasonable expectation of privacy at some point in time in the content created using the "SAS" user profiles—and, as explained above, he has failed to offer any evidence that he did—the relevant question is whether he had a privacy interest in the computers at the time they were seized pursuant to the Office Warrant.  The record does not support such a finding.  All the computers at issue were recovered from the premises of Themis Law, which was co-owned by Defendant Babbs, Dkt. 76-1 at 4 (Valdini Aff. ¶ 12), and, notably, neither Maresca nor Synergy Attorney Services has asserted a continuing property interest in any of the computers or their content.  Maresca has not argued, for example, that the computers remained personal or Synergy Attorney Services property that was merely stored at the Themis Law office suites.  Nor has he offered any evidence that a confidential Synergy Attorney Services or SAS user password was required to access the relevant content or that Themis Law personnel could not create or access content on any segregated portions of the computers.

These omissions are dispositive.  To the extent that Maresca or Synergy Attorney Services transferred ownership, custody, or control of computers to Themis Law without

restriction, he can no longer assert an interest as sole proprietor in those computers.  And, in the absence of any such evidence, the most plausible inference is that any content stored on the "SAS" profiles was either created by, or was transferred to and controlled by, Themis Law.  So, even if a sole proprietor might challenge a search of company property without establishing a personal privacy interest in the invaded place, Maresca has failed to show that the "SAS" user profiles were maintained and controlled by his sole proprietorship at the time of the seizure.  Maresca bears the burden of proof with respect to standing, and merely pointing to the presence of "SAS" profiles on computers found in the Themis Law offices does not suffice.

That leaves only two computers—forensic image 1B152_1, found on a desk in the "Accounting" office, and forensic image 1B152_7, recovered from the floor of a vacant office used for storage.  Maresca argues that he used both computers and therefore has a personal connection to them.  Dkt. 155 at 7.  The government argues that Maresca cannot demonstrate a reasonable expectation of privacy in either computer because they "were recovered from open locations in the office suites where they were used by others, shared with others, and readily accessible to others."  Dkt. 148 at 16.  In response, Maresca argues that binding authority establishes that an employee need not have "exclusive use of an area or the item in order to have a reasonable expectation of privacy."  Dkt. 201 at 15; *see also* Dkt. 155 at 4.

Although the Court agrees with Maresca that non-exclusive use of an area or item does not necessarily extinguish an employee's reasonable expectation of privacy, *see Mancusi v. DeForte*, 392 U.S. 364, 368–70 (1968); *United States v. Most*, 876 F.2d 191, 198 (D.C. Cir. 1989); *SDI Future Health*, 568 F.3d at 697, mere use of a shared computer does not establish a reasonable expectation of privacy, *cf. United States v. Beaudion*, 979 F.3d 1092, 1099 (5th Cir. 2020) (defendant lacked any privacy interest in girlfriend's phone that he "sometimes

38

used . . . for personal activities"). The Court must still consider the strength of Maresca's

personal connection to the two computers (forensic images 1B152_1 and 1B152_7), as informed

by the frequency and character of his access to and use of the computers. Because Maresca's

asserted privacy interest in each computer depends on different evidence, the Court will analyze

each separately. On this record, Maresca has failed to demonstrate a reasonable expectation of

privacy in forensic image 1B152_1. He has, however, cleared the bar—albeit just barely—for

asserting a privacy interest in his password-protected files on forensic image 1B152_7.

### Forensic Image 1B152_1

Forensic image 1B152_1 was found on a desk in Room L. According to the placard on

the door, Room L was the "Accounting" office. Dkt. 148 at 7; Dkt. 176-1 at 73. The office

contained a single desk, which hosted a Minnie Mouse coffee mug, framed personal photos, a

series of post-it notes, a calculator, a printer, and a speaker. Dkt. 179 at 36; Dkt. 176-1 at 74. At

the time of the search, "a red handbag with a handkerchief or some sort of a scarf tied to it" sat

beneath the windowsill. Dkt. 179 at 36; Dkt. 176-1 at 74. It appears that the office was being

actively used by someone other than Maresca, who had his own office.

The FBI CART team found that forensic image 1B152_1 contained three system-

generated Windows profiles and one user-generated Windows profile named "Synergy Finance."

Dkt. 176-1 at 13. The Synergy Finance profile was password protected. Dkt. 192 at 2 (Lyon

Decl. ¶ 4); Dkt. 194 at 2 (Mancini Decl. ¶ 6). Maresca also submitted the results of a forensic

analysis of "user account information" stored on the Synergy Finance profile. *See* Dkt. 155

(Sochaczevski Decl.); Dkt. 188 at 44–61 (Lyon). The analysis returned results for user accounts,

including internet-based logins, that were saved to the hard drive of the computer. Dkt. 188 at

46–47 (Lyon). Maresca's expert testified that the user accounts saved on a computer's hard

drive are a "strong indication of the users of that machine." *Id.* at 47 (Lyon).  Of the 121 total user accounts identified on forensic image 1B152_1, five user accounts contained "Maresca" in the username field.  *Id.* at 49–52 (Lyon).

Based on this evidence, the Court can reasonably infer that Maresca used forensic image 1B152_1 at some point.  But Maresca has not produced any evidence about the frequency or character of his use of the computer, *see, e.g.*, *United States v. Torch*, 609 F.2d 1088, 1091 (4th Cir. 1979) (examining the "nature and character" of the searched area and defendant's relationship to the seized items), and what little evidence is in the record suggests that Maresca was not the primary user of the computer; to the contrary, he is (arguably) associated with less than 4% of the user accounts saved on forensic image 1B152_1.  Furthermore, the computer was discovered in a private office apparently used by a different Themis Law employee, who performed duties relating to "accounting."  Maresca has failed to carry his burden of demonstrating that he had a reasonable expectation of privacy in another employee's office or in a computer used by that other employee.  *See Stewart v. Evans*, 351 F.3d 1239, 1243 (D.C. Cir. 2003) (explaining that Supreme Court precedent "offers little support for the reasonableness of [privacy] expectations with respect to the offices of *other* employees" (emphasis in original)); *United States v. Taketa*, 923 F.2d 665, 671 (9th Cir. 1991) (employee lacked any privacy interest in coworker's office, even though he had access to it); *Chuang*, 897 F.2d at 650–51 (corporate officer lacked any privacy interest in documents obtained from the office of another corporate officer).  On this record, Maresca has, at best, a weak personal connection to forensic image 1B152_1.

In this context, an employee's personal stake in the object of a search will not suffice to establish Fourth Amendment standing where that employee made no attempt to keep the place

40

searched or the item seized private.  *See Nagle*, 803 F.3d at 178.  An employee must therefore show that he "took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization."  *SDI Future Health*, 568 F.3d at 698; *see id.* at 699 (requiring defendants to show on remand that they "took measures, each on his or the pair's personal behalf, to keep the [seized] items private and segregated from other business materials").  Maresca, however, has failed to proffer any evidence that he segregated and protected his files and user activity from those of other users of the computer, or that he used any other security measures, such as encryption, to protect materials that he stored on that computer. To be sure, the Synergy Finance profile was password protected, Dkt. 192 at 2 (Lyon Decl. ¶ 4); Dkt. 194 at 2 (Mancini Decl. ¶ 6), but Maresca does not claim to have created the Synergy Finance profile or to have set its password.  Nor does he claim that other Themis Law employees lacked access to the computer, and he cannot establish a personal privacy interest by relying on security measures that Themis Law employed to ensure the privacy of its business records. Those measures "are relevant only to the standing of the corporation itself, not of its officers." *SDI Future Health*, 568 F.3d at 698; *see Nagle*, 803 F.3d at 178 (finding that a corporate officer had no reasonable expectation of privacy on his files and emails located on a password-protected company server because "he failed to show what efforts *he* made to keep *his* materials private from others" (second emphasis in original)).

In sum, although Maresca has at least a de minimis personal connection to forensic image 1B152_1 based on his apparent use of that computer, his connection is too weak to show either that he had a subjective expectation of privacy in forensic image 1B152_1 or that any such expectation was objectively reasonable.  Maresca has not shown that he reasonably believed that

materials he stored on a computer found in someone else's office would remain private without his authorization or that he took any steps to protect that material from disclosure.

**Forensic Image 1B152_7**

The last computer, corresponding to forensic image 1B152_7, presents the closest question of Maresca's Fourth Amendment standing—made all the more difficult because Maresca failed to submit any direct evidence of his control over or use of this computer. Nonetheless, several considerations lead the Court to find that Maresca had a reasonable expectation of privacy over his own files and user activity stored on forensic image 1B152_7.

The search team discovered forensic image 1B152_7 in Room H, a vacant office labeled "Synergy Staffing," which appears to have been used for storage. Dkt. 176-1 at 103–05; Dkt. 179 at 44–48. The Synergy Staffing room was adjacent to Maresca's personal office. Dkt. 176-1 at 102; Dkt. 148 at 5. The computer was found lying on the floor, disconnected from any power source. Dkt. 176-1 at 107; Dkt. 179 at 46–47. The back of the computer was labeled "DAVES OLD PC." Dkt. 176-1 at 108; Dkt. 179 at 47. Once booted up, the computer contained three system-generated Windows user profiles, Dkt. 188 at 19 (Mancini), and two user-generated profiles, one named "Dave" and one named "tblac," *id.* at 19–20 (Mancini); Dkt. 192 at 2 (Lyon Decl. ¶ 5). The user-generated "Dave" and "tblac" profiles were each locked with unique passwords. Dkt. 192 at 2 (Lyon Decl. ¶ 5). A forensic analysis revealed that 235 "user accounts" had been saved to the computer's hard drive. Dkt. 188 at 56 (Lyon). Of those 235 accounts, 130 contained the string "Maresca" in the username field. *Id.* at 57–58 (Lyon).

This evidence suggests that the computer was primarily used by the holder of the "Dave" user profile and the holder of the "tblac" user profile. Both primary users segregated their files and user activity from one another and protected their materials with a password. Dkt. 192 at 2–

3 (Lyon Decl. ¶ 6).  In all likelihood, Maresca was one of these primary users.  "Dave" is a variation on his first name, the back of the computer is labeled "DAVES OLD PC," and more than half of the user accounts saved to the computer's hard drive contain his last name.  The Court can therefore reasonably infer that Maresca created and password protected the "Dave" user profile, and thereby ensured that his user activity and files would be segregated from other users of the computer and would be inaccessible to anyone without his password.[9]

Courts have analogized a password-protected digital account to a locked or closed container, which ordinarily gives rise to a reasonable expectation of privacy.  *See, e.g.*, *United States v. Andrus*, 483 F.3d 711, 718–19 (10th Cir. 2007); *United States v. Slanina*, 283 F.3d 670, 676 (5th Cir. 2002), *overruled on other grounds by Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002); *Bowers v. Cnty. of Taylor*, 598 F. Supp. 3d 719, 729 (W.D. Wis. 2022).  Maresca's password, like a physical lock on a container, evinces his intent to prevent unauthorized third parties from accessing the contents of the "Dave" user profile.  His control over and right to exclude others from the "Dave" user profile gave him a reasonable expectation of privacy in its password-protected contents.  *See United States v. Ziegler*, 474 F.3d 1184, 1188–90 (9th Cir. 2007) (employee had reasonable expectation of privacy in password-protected work computer); *Slanina*, 283 F.3d 670 at 676–77 (public employee had reasonable expectation of privacy in password-protected work computer); *see also Bowers*, 598 F. Supp. 3d at 728–30 (public employee had reasonable expectation of privacy in password-protected Dropbox account created

---

[9] Based on the name of the "tblac" user profile and the user accounts saved to that profile, *see* Dkt. 194 at 3 (Mancini Decl. ¶ 10) (identifying one syncing Google Chrome account, tblackstone@synergylawllc.com, stored on the "tblac" Windows user profile), the Court can reasonably infer that the other primary user of the computer was co-defendant Terrylle Blackstone.  *See also* Dkt. 201 at 25 (government's position that the "tblac" user profile "refers to Terrylle Blackstone").  Blackstone has not moved to suppress the evidence at issue.

with work email).  Maresca does not, however, have a reasonable expectation of privacy in any of the files or user activity stored on the other Windows user profiles, which he presumably did not use or password protect.

The government contends that Maresca lacks a reasonable expectation of privacy in the "Dave" user profile because other Themis employees had access to both the profile itself and the "Synergy Staffing" office where the computer was found.  Dkt. 148 at 17; Dkt. 201 at 22–24. But as the D.C. Circuit has explained, "[i]t is privacy that is protected by the Fourth Amendment, not solitude."  *Most*, 876 F.2d at 198 (alteration in original) (quoting *O'Connor*, 480 U.S. at 730 (Scalia, J., concurring in judgment)).  Individuals may—and often do—maintain a reasonable expectation of privacy in property that is not dedicated to their exclusive use.

The Supreme Court's decision in *Mancusi v. DeForte* confirms that this principle applies to the workplace.  There, the Court recognized that a union officer had a reasonable expectation of privacy in a shared office because he "could reasonably have expected that only [his office mates] and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups."  392 U.S. at 369.  So, even though the union officer did not exercise exclusive control over the searched office or the seized records, his reasonable expectation that records in his custody would be accessible only to authorized individuals was sufficient to confer Fourth Amendment standing.  Consistent with *Mancusi*, several circuits have recognized that an employee need not enjoy exclusive use of a searched area or a seized item to have a reasonable expectation of privacy.  *See SDI Future Health*, 568 F.3d at 697; *United States v. Mancini*, 8 F.3d 104, 108 (1st Cir. 1993); *Torch*, 609 F.2d at 1091.  Although exclusive use is highly probative of a person's subjective expectations and the reasonableness of those expectations, *see, e.g.*, *Ziegler*, 474 F.3d at 1190; *United States*

44

*v. Galecki*, 89 F.4th 713, 724–25 (9th Cir. 2023), it is not dispositive when there are countervailing indications of a privacy interest.

Here, Maresca did not lose his reasonable expectation of privacy in his segregated and password-protected materials on the computer at issue by ceasing to use the computer and by placing it in a storage area inaccessible to the general public.  In *United States v. Mancini*, the First Circuit faced similar facts in the brick-and-mortar context and concluded that the defendant in that case had a reasonable expectation of privacy in records stored outside of his personal office.  There, a mayor stored his old appointment books in boxes in the archive attic of the town hall building where his office was located.  *Mancini*, 8 F.3d at 106, 110.  The attic was locked, but both the maintenance and personnel departments had keys.  *Id.* at 106.  The mayor's boxes were "clearly labeled and [] segregated" from other materials stored in the attic, *id.* at 110, and everyone who worked in the building knew not to touch those materials without prior authorization from the mayor or his secretary, *id.* at 110 & n.11.  The court concluded that he had a reasonable expectation of privacy in his stored materials because he "could have expected that only members of the maintenance or personnel staff, who had instructions not to disturb the Mayor's boxes, could enter the attic, and that his personal records would not be touched except with his permission or that of his Chief of Staff."  *Id.* at 110.

Likewise, Maresca exhibited an expectation of privacy by labeling and segregating his files and user activity from other materials—both the files and user activity stored on the "tblac" user profile, and those associated with the unprotected, system-generated user profiles.  His password played the same role as the mayor's instructions in *Mancini*.  Nobody could access his files and user activity unless he gave them prior authorization by sharing his password.  Although the computer was recovered from a storage room, that room was located in a locked

office suite, inaccessible to the public. *See* Dkt. 179 at 65. On these facts, Maresca could reasonably expect that only Themis employees would have access to the "Synergy Staffing" room and that the files and user activity stored on the "Dave" user profile could not be accessed without his authorization. *Cf. United States v. Roberts*, No. 3:08-cr-175, 2010 WL 234719, at *11 (E.D. Tenn. Jan. 14, 2010) (relying on *Mancini* and finding that employees had reasonable expectations of privacy in password-protected computer files on company's server).

To the extent that Maresca shared his password with other Themis employees, that also did not extinguish his reasonable expectation of privacy. By sharing his password, Maresca exposed himself to the risk that other employees would share the contents of his user profile. *See United States v. Jacobsen*, 466 U.S. 109, 117 (1984) ("It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities . . . ."). He did not, however, invite the government or others to search his files; a person "may relinquish [his] expectation of privacy vis-a-vis bailee or colleague while retaining [his] expectation vis-a-vis police." *United States v. Burnett*, 890 F.2d 1233, 1238 (D.C. Cir. 1989) (citing *Most*, 876 F.2d at 198–99); *see Mancusi*, 392 U.S. at 368–69 (finding it "irrelevant" to union officer's expectation of privacy "that the Union or some of its officials might validly have consented to a search of the area where the records were kept"); *cf. Marshall v. Barlow's, Inc.*, 436 U.S. 307, 314–15 (1978) ("The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents").

Like the union officer in *Mancusi*, or the mayor in *Mancini*, Maresca could have reasonably expected that only authorized individuals—*i.e.*, people with whom he shared his password—would have access to his files and user activity. *See Mancusi*, 392 U.S. at 369;

46

*Mancini*, 8 F.3d at 108 ("Moreover, although Mancini's secretaries had access to the appointment calendar, shared access to a document does not prevent one from claiming Fourth Amendment protection in that document." (footnote omitted)).  In this respect, the private files found on the computer are not materially different from the files found on the computers located in his personal office; it is possible that someone else from Themis Law might have accessed those files, but Maresca nonetheless maintained a reasonable expectation of their privacy.

For those reasons, Maresca had a reasonable expectation of privacy in the files and user activity stored on the "Dave" user profile on forensic image 1B152_7, and the Court will grant his motion to suppress as to the contents of that profile.  Maresca's expectation of privacy, however, does not extend to any files or user activity stored in or associated with the Windows user profiles on forensic image 1B152_7 other than "Dave."

c.    Privilege Review Process

As explained above, Maresca has failed to show that his personal privacy interests were invaded by the searches of forensic images 1B152_1, 1B152_2, 1B152_3, 1B152_6, 1B152_8, 1B152_9, 1B152_10, and 1B153_1, and the data stored on the Windows user profiles on forensic image 1B152_7 other than "Dave."  Before resolving his motion to suppress as to those devices and materials, however, the Court must consider Maresca's Hail Mary suggestion that the government effectively conceded his standing by inviting him to conduct a privilege review of the office computers.

It is true that Fourth Amendment standing is non-jurisdictional and that, accordingly, the government can waive Fourth Amendment standing.  *See United States v. Sheffield*, 832 F.3d 296, 304–05 (D.C. Cir. 2016) (citing *Carter*, 525 U.S. at 87).  But by inviting Maresca to conduct a privilege review, the government merely gave Maresca the *opportunity* to *assert* a

47

protected interest in specific records stored on the office computers.  It did not acknowledge or concede that Maresca actually had a reasonable expectation of privacy in any of those records or in the office computers in their entirety, any more than it conceded that any assertion of privilege would be well founded.

Maresca fails to identify any precedent even suggesting that the government or the Court must proceed in a particular order in resolving disputes regarding the Fourth Amendment or privileges.  Maresca, of course, had the right to raise both types of objections to the government's use of the evidence it recovered pursuant to the warrants, and the government was entitled to address Maresca's actual or anticipated objections in whatever order it deemed most efficient.  Indeed, from the government's perspective, it was prudent to assume that the Court *might* agree with Maresca regarding all or part of his arguments regarding standing and to proceed on the assumption (even if the government disagreed) that the Court *might* find that Maresca has a cognizable privacy interest in all or part of the materials at issues.  Proceeding simultaneously with a privilege review did not, absent some affirmative representation, constitute a concession of Fourth Amendment standing.

Any doubt that this is what occurred is put to rest by the fact that the government asked all four Defendants to conduct a privilege review of all the devices seized from both the Themis Law office suites and Maresca's residence, *see* Dkt. 202-13, even though it is improbable that Maresca's co-defendants could successfully assert a reasonable expectation of privacy—sufficient to invoke a common-law privilege—in *Maresca's* private office or home.  The government's cautious approach to reviewing potentially attorney-client privileged materials, which may implicate a defendant's Sixth Amendment right-to-counsel rather than his Fourth

48

Amendment rights, does not indicate, let alone concede, any position on Fourth Amendment standing.

For those reasons, the Court is unpersuaded by Maresca's contention that the government waived any objection to Maresca's Fourth Amendment standing by pressing forward with the privilege review before the Court resolved the parties' dispute regarding standing. The Court will therefore deny the motion to suppress as to forensic images 1B152_1, 1B152_2, 1B152_3, 1B152_6, 1B152_8, 1B152_9, 1B152_10, and 1B153_1, and the data stored on the Windows user profiles on forensic image 1B152_7 other than the "Dave" user profile. Given the government's limited opposition to the motion to suppress, however, the Court will grant the motion with respect to the "Dave" user files found on forensic image 1B152_7.

2.    *Effect of the January 2026 Warrant*

Prior to January 8, 2026, the above analysis would have sufficed to resolve Maresca's motion to suppress. The government, however, now maintains that its commitment not to use evidence recovered from Maresca's devices in its case-in-chief applied only to the May 2021 warrant. As a result, on the government's telling, the door is now open for it to argue that its failure to search nineteen of the devices in a timely manner should not trigger the exclusionary rule. The Court is unpersuaded.

As an initial matter, the Court notes that the government concedes that its argument does not apply to the ten devices that are not covered by the January 2026 warrant—that is, the smart phones and tablets seized from Maresca's residence and the Themis Law offices. As the government explains, "Maresca's motion to suppress remains pending before the Court—and the Court has yet to issue a final ruling—as to '10 Apple iPhone and iPads that were seized' during May 2021." Dkt. 262 at 5; *see also id.* at 1 (motion to suppress "remain[s] ripe for resolution as

49

to those ten . . . forensic images"). Notably, the government does not now maintain that its commitment to refrain from using any evidence found on those devices in its case-in-chief moots the suppression motion—nor could it reasonably take that position given its efforts to walk back that commitment with respect to the remaining nineteen devices. *Cf. FBI v. Fikre*, 601 U.S. 234, 241 (2024) (noting in the civil context that "a defendant's voluntary cessation of a challenged practice" moots a case only if the defendant satisfies the "formidable burden" of showing that the challenged practice "cannot reasonably be expected to recur" (citation modified)). Because the government also concedes that Maresca has Fourth Amendment standing to seek suppression of evidence recovered from those devices, because the government does not otherwise defend against Maresca's motion to suppress that evidence, and because, as explained further below, the government failed even to begin scoping those devices within a reasonable time,[10] the Court will grant Maresca's motion to suppress as to these ten devices.

The Court reaches the same conclusion with respect to about half of the remaining nineteen devices, but for slightly different reasons. For the reasons explained above, the Court has already concluded that Maresca lacks Fourth Amendment standing as to eight of the computers seized pursuant to the Office Warrant and as to a subset of files found on a ninth computer. Because Maresca's motion to suppress, in any event, fails as to those computers and files, the Court need not decide whether the January 2026 warrant alters the playing field.

---

[10] Even if the government needed Maresca's input with respect to potentially privileged material before it could *complete* the scoping, it failed even to start the process by running any date or keyword limitations. To be sure, the government eventually argued that it made better sense to finish the privilege review before scoping the devices. But the record shows that the government did not hit on this justification until years into the process and that, in fact, the government had asked the CART examiner to start scoping the devices shortly after the warrants were executed in May 2021. The problem was not that the government needed to complete the privilege review first, but rather, that the examiner never complied with that directive, and that the government failed to notice that omission until November 2025—many years later.

That leaves ten computers (and a portion of the files found on an eleventh) in dispute, most of which were seized from Maresca's residence. As to these computers, the government asserts that Maresca's motion to suppress is now moot. Dkt. 262 at 4. The motion is moot, according to the government, because the motion was premised exclusively on Maresca's assertion of unreasonable delay in scoping, and there is no reason to doubt that the government will "expeditiously complete its review of [these] devices" pursuant to the January 8, 2026, warrant. *Id.* In short, on the government's telling, the new warrant cures any defect resulting from unreasonable delay in segregating the responsive from the non-responsive materials that were first seized in May 2021. The government also argues that its prior agreement not to use material recovered from these devices in its case-in-chief applied only to searches conducted pursuant to the May 2021 warrants. *Id.* at 9. For the reasons explained below, the Court is unpersuaded that the January 2026 warrant released the government from its commitment not to use any evidence recovered from the ten computers and portions of the eleventh computer in its case-in-chief.

First, the Court is unpersuaded that the government's commitment came with an implicit proviso or that it was limited to searches conducted pursuant to the May 2021 warrants. To the contrary, the government's representations were unconditional. The government represented that it "will not use any evidence recovered from those forensic images in its case in chief at trial," Dkt. 148 at 7 n.4, and that it had "informed the defendant that it will not use any evidence from twenty of [the] devices" seized from Mr. Maresca's personal office space and residence "in its case-in-chief at trial," Dkt. 150 at 1. Indeed, in January, the government told the Court:

> [T]he government has taken responsibility in the sense that the government is not going to use the materials in its case in chief. The government has already self-regulated and [is] not going to benefit from any delay. The government will

51

only use nine of the devices for which we don't believe the defendant has standing.

Dkt. 237 at 106–07.  None of these assertions included any proviso or limitation; the government just represented—plain and simple—that it would not use "any evidence from twenty of those devices in its case-in-chief at trial."  Dkt. 150 at 1.

Notably, the government does not take issue with this understanding of the record. Instead, its argument that it is now free to use evidence recovered from the devices in its case-in-chief is based on a single premise.  It argues that Maresca "misstates" the government's concession because "[t]he government has never stated it would not seek a separate warrant for these nineteen forensic images."  Dkt. 262 at 9.  That is a non sequitur.  The government is correct that it never committed not to seek a new warrant.  But that does not mean that the government never committed to refrain from using the seized material in its case-in-chief.  Both can be true, and, indeed, counsel for the government made the above quoted representation— "[t]he government will only use nine of the devices for which we don't believe the defendant has standing"—in virtually the same breath that it reserved its right to seek a new warrant.  Dkt. 237 at 107–08.  It is telling that the government points to no evidence even hinting that its commitment was limited to the existing warrants.

The government's commitment matters for several reasons.  First and foremost, the government is expected to turn square corners and to abide by its commitments.  As the Third Circuit has observed, "[p]rosecutors routinely . . . make representations to the court . . . . Whether they do so strategically or for reasons of convenience is of no moment.  Once prosecutors undertake such commitments, they are bound to honor them."  *United States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010); *see also United States v. Lingala*, 91 F.4th 685, 694 n.6 (3d Cir. 2024) (same).  That principal applies with particular force in the present context,

where the parties and the Court spent months litigating Maresca's standing motion based on the government's commitment. The Court held two factual hearings and heard extensive argument. The parties filed multiple briefs and factual submissions, which were limited to the question of standing. It is too late for the government to reevaluate its litigation position and to seek a do-over based on *its* decision—a decision *it* could have made months or years ago—to seek a new warrant. Indeed, to this day, the government has not asked to be relieved of its commitment for good cause, presumably because this is not a case in which some new information or other development has caught the government by surprise or arguably justifies a reassessment of the case. The only intervening event is an event of the government's own instigation. The Court will, accordingly, hold the government to its commitment.

The government's argument, however, suffers from a second and independently sufficient flaw. According to the government, the issuance of the new warrant cures any constitutional violation based on the government's years-long delay in identifying and segregating the non-responsive material stored on the seized devices. But that ignores the fact that Maresca's motion to suppress—unlike his motion for prospective relief—is backward looking. Maresca argues that the government violated his Fourth Amendment rights by seizing his devices and then waiting years before even attempting to segregate the material contained on those devices as to which the government undoubtedly lacks probable cause from the responsive material. If the government's delayed execution of the May 2021 search warrant violated the Fourth Amendment, the January 2026 search warrant might, as discussed below, end that constitutional violation. But it would not make the delay between May 2021 and January 2026 any less a violation of Maresca's constitutional rights. Because the government has abandoned any defense of the reasonableness of its delay for purposes of litigating Maresca's motion to

53

suppress, the only question is whether the "deterrence benefits" of applying the exclusionary rule

to the government's conduct here "outweigh its substantial social costs." *Hudson v. Michigan*,

547 U.S. 586, 591 (2006) (citation modified). In Maresca's view, they do. Dkt. 258 at 5–8.

Although relevant precedent is sparse, the precedent that Maresca offers in support of his

position is far more on point than the countervailing precedent offered by the government. In the

principal case that Maresca invokes, *United States v. Burgard*, the police officers seized the

defendant's cell phone without a warrant but then "lost their sense of urgency," "did nothing

with the phone right away[,] and allowed six days to elapse before they applied for a search

warrant." 675 F.3d 1029, 1030 (7th Cir. 2012). They then searched the phone and "found

sexually explicit images of underage girls." *Id.* On the facts of that case, the Seventh Circuit

concluded that the police obtained a search warrant within a reasonable time. *Id.* at 1034. But

the court went on to address, and to reject, the district court's alternative theory, which

concluded that "suppression would be inappropriate because the officers searched the phone in

reliance on a warrant." *Id.* at 1035. As relevant here, Judge Wood explained:

> When an officer waits an unreasonably long time to obtain a search warrant, in
> violation of the Fourth Amendment, he cannot seek to have evidence admitted
> simply by pointing to that late-obtained warrant. If this were all that was needed,
> evidence would never be suppressed following these types of violations because,
> by definition, the police would always have a warrant before they searched. In
> the line of Supreme Court decisions on which we have relied, the question is not
> whether police ultimately obtained a warrant; it is whether they failed to do so
> within a reasonable time. The Court has never suggested that this type of
> violation is wholly exempt from the exclusionary rule. Furthermore, removing
> this sort of police misconduct from the ambit of the exclusionary rule would
> have significant implications: it would eliminate the rule's deterrent effect on
> unreasonably long seizures. Police could seize any item—a phone, a computer,
> a briefcase, or even a house—for an unreasonably long time without concern for
> the consequences, evidentiary and otherwise.

*Id.* (citations omitted); *see also United States v. Wilkins*, 538 F. Supp. 3d 49, 95–96 (D.D.C.

2021) (reaching same conclusion). Although this case does not turn on a warrantless seizure,

54

much of the Seventh Circuit's analysis applies here.  To start, as in *Burgard*, if the government were correct, and it could cure a long delay in scoping a warrant return by simply seeking and obtaining a new warrant, "evidence would never be suppressed following these types of violations."  675 F.3d at 1035.  And, even more importantly, "removing this sort of . . . misconduct from the ambit of the exclusionary rule . . . would eliminate the rule's deterrent effect on unreasonably long" delays in scoping devices containing reams of non-responsive personal material.  *Id.*; *see also Wilkins*, 538 F. Supp. 3d at 96 (same).

In contrast, the government invokes the Fourth Circuit's recent decision in *United States v. Krueger*, 145 F.4th 460 (4th Cir. 2025).  In that case, the government seized the defendant's devices in 2019 but did not seek a search warrant until 2022.  *Id.* at 464.  Although the court held that the district court had correctly denied the defendant's suppression motion, it explained that *Krueger* was an "unusual case," since "the time taken by federal authorities to obtain a federal warrant had no effect on the length of the seizure in question."  *Id.* at 467.  As the court elaborated:

> Krueger's devices were seized by *state* police officers pursuant to a state warrant in November 2019, and then retained in state custody throughout both the state and federal phases of these criminal proceedings.  Nothing about the federal warrant – allowing a search of copies of the devices' contents, while the devices themselves remained with the state – had anything to do with the length of time for which Krueger was deprived of a possessory interest in his devices.  Krueger has pointed to no record evidence suggesting that the state might have released his property sooner had the federal authorities more promptly sought their warrant.

*Id.*  In short, the defendant asserted his claim of "'unreasonable delay' . . . against the wrong sovereign."  *Id.*

Neither line of precedent is directly on point, but Maresca has the better of the arguments.  If the exclusionary rule is to have any deterrent effect, the type of constitutional violation at issue

55

here—failing to segregate responsive from non-responsive material contained on electronic devices for a period of years—must have some consequence, beyond requiring the government to undertake the burden of obtaining a new warrant, years after the fact.  The government's approach would permit law enforcement to seize a suspect's electronic media, media that often contains almost every detail of a person's daily life; to hold that media for years without segregating the material that falls within the scope of the warrant from the material that does not; and, then, to avoid any consequence for the constitutional violation by simply obtaining a new warrant years later.  That theory makes little sense in any context—but it is beyond the pale in a case in which the government committed not to use the material at issue in its case-in-chief, and the only intervening fact is that the government had a strategic change of heart and obtained a new warrant.

*    *    *

The Court, accordingly, holds that the government may not use in its case-in-chief any material recovered from the devices seized from Maresca's residence or the Themis Law offices, except for evidence found on forensic images 1B152_1, 1B152_2, 1B152_3, 1B152_6, 1B152_8, 1B152_9, 1B152_10, and 1B153_1, and on the portions of forensic image 1B152_7 other than files associated with the "Dave" user profile.

**B.      Motion for Prospective Relief**

Maresca's motion for prospective relief implicates different considerations, which lead to a different result.  In this motion, Maresca maintains that any future searches of the twenty-nine seized devices would violate his Fourth Amendment rights, and he, accordingly, asks that the Court bar the government from conducting any such searches.  Although he has not sought return of the devices pursuant to Rule 41, he asks that the Court place the devices off limits to the government, essentially sealing the forensic images.  The other two Defendants in the case,

56

Marinelli and Babbs, initially agreed to waive their rights under *Brady* and its progeny to any evidence contained on the unscoped (and unsearched) devices. Dkt. 238 (Marinelli); Dkt. 256 (Babbs) (referring to waiver made at prior hearing). But after the government obtained a new warrant for nineteen of the devices and began to search at least some of those devices, Marinelli and Babbs clarified their respective positions. As explained above, Marinelli no longer agrees to waive his *Brady* rights with respect to the nineteen devices covered by the January 8, 2026, warrant, Dkt. 254 at 2–3,[11] while Babbs no longer agrees to waive his rights with respect to any device that the government has scoped or that the Court "ultimately permits the government to continue to search," Dkt. 256 at 1. Both still agree, however, to waive their *Brady* rights with respect to the ten unscoped devices, assuming that the Court precludes the government from searching those devices. *Id.*; Dkt. 254 at 3.

Before turning to the substance of Maresca's motion for prospective relief, the Court can quickly exclude eight devices—and portions of a ninth device—from the realm of debate. For the reasons explained above, Maresca lacks Fourth Amendment standing to seek relief—retrospective or prospective—as to those devices. Because Fourth Amendment rights are personal in nature, those devices are not at issue. As to the remaining twenty devices, they fall into two groups: the ten devices that are governed exclusively by the May 2021 warrants, and the remaining devices that were initially seized pursuant to the May 2021 warrants and that the government maintains it is entitled to search pursuant to the January 2026 warrant. For the reasons explained below, the Court reaches different conclusions for these different groups.

---

[11]  It is possible that Marinelli might refine his position in light of the government's representation that it has reviewed only two of the nineteen devices subject to the new warrant, Dkt. 266 at 1–2, and that he might agree to waive his *Brady* rights with respect to the remaining seventeen devices. But to date, he has not done so.

1.    *Reasonableness of the Government's Offsite Review*

Unlike many Fourth Amendment challenges, this case does not turn on the validity of a warrant or the lawfulness of the initial seizure of the defendant's property.  Once law enforcement obtains a valid search warrant, the Fourth Amendment "generally le[aves] [it] to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant."  *Dalia v. United States*, 441 U.S. 238, 257 (1979).  But that general rule is "subject[,] of course[,] to the general Fourth Amendment protection 'against unreasonable searches and seizures.'"  *Id.*  In short, "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness."  *Id.* at 258; *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *United States v. Heldt*, 668 F.2d 1238, 1256 (D.C. Cir. 1981).  This reasonableness inquiry takes on heightened importance in the context of search warrants for electronically stored information.

The execution of a warrant for electronic media poses unique challenges for law enforcement and implicates significant Fourth Amendment interests.  The problem is that the volume and nature of information stored on computers and other electronic devices makes it "often impractical . . . to review all of the information during execution of the warrant at the search location."  Fed. R. Crim. P. 41(e) advisory committee's note to 2009 amendment.  In addition to the immense storage capacity of electronic devices, law enforcement may need to use sophisticated forensic techniques to overcome passwords, encryption, or other "booby traps" to obtain access to materials responsive to the warrant.  *Id.*  Any search for or manipulation of digital data, moreover, must be done with care, "lest this data be altered or destroyed," *United States v. Ganias*, 824 F.3d 199, 212 (2d Cir. 2016) (en banc), or the authenticity or integrity of the evidence called into question.

58

To address these challenges, the Judicial Conference amended Federal Rule of Criminal Procedure 41(e) in 2009 to authorize a two-step process for the seizure of electronic storage media and electronically stored information. *See* Fed. R. Crim. P. 41(e) advisory committee's note to 2009 amendment. Under Rule 41(e)(2)(B), law enforcement may first "seize or copy [on-site] the entire storage medium" and, then, "review it later [off-site] to determine what electronically stored information falls within the scope of the warrant." *Id.* This two-step process is necessary in the digital age, but it also raises Fourth Amendment concerns. Searches for electronically stored information necessarily result in the "seizure and subsequent retention by the government of . . . vast quantities of irrelevant" personal information, *Ganias*, 824 F.3d at 218, which individuals have a strong interest in shielding from the government, *see Riley v. California*, 573 U.S. 373, 393–97 (2014). "Tax records, diaries, personal photographs, electronic books, electronic media, medical data, records of internet searches, banking and shopping information—all may be kept in the same device, interspersed among the evidentiary material that justifies the seizure or search." *Ganias*, 824 F.3d at 218.

As Rule 41 recognizes, the "over-seiz[ure]" of data outside the scope of the warrant is "an inherent part of the electronic search process." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (per curiam). But that practical necessity does not mean that every over-seizure—no matter the circumstances and no matter how long the government takes to segregate responsive from non-responsive records—is reasonable and thus constitutionally permissible. *See Zelaya-Veliz*, 94 F.4th at 338 (timing of the government's off-site review and the corresponding duration of its over-seizure of non-responsive records is subject to the Fourth Amendment's general reasonableness standard); *see also Asinor v. District of Columbia*, 111 F.4th 1249, 1258–59 (D.C. Cir. 2024) ("At both the

moment of seizure and throughout its duration, the government's conduct must be reasonable . . . ."); *Metter*, 860 F. Supp. 2d at 215 ("[T]he Fourth Amendment requires the government to complete its review, *i.e.,* execute the warrant, within a 'reasonable' period of time."). The Court must, accordingly, engage in a case-by-case assessment of whether the government failed to complete its off-site review of seized devices within a reasonable amount of time and thereby "prolonged retention of non-responsive data" in violation of the Fourth Amendment. *Zelaya-Veliz*, 94 F.4th at 338.

This case presents an extreme example of delay in executing a warrant for electronic records. It has now been four-and-a-half years (and counting) since the May 2021 searches of the Themis Law office suites and Maresca's residence, and the government has yet to complete that crucial step of reviewing the seized devices, so that non-responsive materials can be segregated or returned, as appropriate. To be sure, in November 2025, the government agreed "not [to] conduct any further searches of the forensic images without further direction from the Court," Dkt. 216 at 5, in order to provide the Court with an opportunity to resolve Maresca's motion for prospective relief. But even with recent developments, the Court is persuaded that the government's prolonged retention of non-responsive material, and its failure to make any meaningful effort to segregate non-responsive material from responsive material for more than four years, cannot be reconciled with the Fourth Amendment's reasonableness standard.

"[R]easonableness is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (citation modified); *United States v. Ginyard*, 628 F. Supp. 3d 31, 50 (D.D.C. 2022) (quoting *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007)); *see also*

*United States v. Smith*, 967 F.3d 198, 212 (2d Cir. 2020) ("[T]he constitutional reasonableness of delay depends on the assessment and balancing of multiple factors."). Other courts evaluating the reasonableness of the duration of the government's off-site review of seized digital devices have focused on the nature of the defendant's property interests, the length of the delay, the government's justification—or lack thereof—for the delay, evidence of bad-faith, and prejudice to the defendant. The Advisory Committee's notes explaining Rule 41(e)(2)(B) and case law reviewing the execution of warrants for electronically stored information suggest that the workload of forensic specialists, technical obstacles, and the need to conduct a privilege review, among other things, may make even a lengthy delay reasonable. *See* Fed. R. Crim. P. 41(e) advisory committee's note to 2009 amendment (citing "the workload of the computer labs" and "difficulties created by encryption and booby traps" as reasons why "[a] substantial amount of time can be involved in the forensic imaging and review of information"); *e.g.*, *United States v. Nejad*, 436 F. Supp. 3d 707, 735 (S.D.N.Y. 2019) (considering the "volume of documents, the various obstacles to review, and the resource constraints under which the D.A. was operating"); *United States v. Cawthorn*, 682 F. Supp. 3d 449, 458 (D. Md. 2023) (acknowledging that "a reasonable period of time must account for the complexity of electronic evidence, the large amounts of evidence, [and] the workloads of investigating agents" (citation modified)).

Although lengthy delays are acceptable under some circumstances, the lacuna of more than four years in this case—when almost no effort was made to scope the devices—does not fall within the bounds of delay sanctioned by courts. "[N]umerous cases hold that a delay of several months or even years between the seizure of electronic evidence and the completion of the government's review of it is reasonable," Dkt. 137 at 14 (quoting *United States v. Jarman*, 847 F.3d 259, 267 (5th Cir. 2017)), but the government has not cited, and the Court has not found,

61

any case sanctioning a delay of longer than four years between the on-site seizure of digital devices and the *completion* of the off-site review of those devices.  In *United States v. Bradley*, for example, the Eleventh Circuit concluded that the government's off-site review of 103 computers was not unreasonably delayed where it took three years from start to finish.  644 F.3d 1213, 1258 n.95 (11th Cir. 2011); *see also Nejad*, 436 F. Supp. 3d at 735 (three-year period reasonable to review one million documents in three languages).  Here, however, and unlike in those cases, beyond pulling certain financial records, the government did not even *begin* to scope the devices seized from the Themis Law office suites and Maresca's residence until January 2025, more than three years after the May 2021 searches.  *Cf. United States v. Mendlowitz*, No. 17 CR. 248, 2019 WL 1017533, at *11–12 (S.D.N.Y. Mar. 2, 2019) (eighteen-month delay in reviewing "exceedingly large" universe of documents reasonable where the government began its review two months after the search warrant had been executed on-site).  And even that effort fell well short of acceptable standards of diligence, since Agent Lawrence failed to recognize that—at that time—she had access to only the file extensions containing financial and tax records that the FBI had released to the prosecution team back in 2022.  Dkt. 232 at 17, 27.  It was not until November 2025, that Agent Lawrence noticed that she had not, in fact, reviewed any "PDFs, . . . Word documents, [or] emails" and that "[t]he only thing that [she] was seeing were" the financial and tax records.  *Id.* at 27–28.

Notably, other courts have found delays as short as two years to be unreasonable where the government lacked a reasonable explanation for the delay or acted in bad faith.  *See Metter*, 860 F. Supp. 2d at 212, 214–16 (finding fifteen-month delay unreasonable where the government's conduct evinced a "lack of good faith"); *Cawthorn*, 682 F. Supp. 3d at 458–59 (finding two-year delay unreasonable where the government did "not justify its delay").  Here,

62

the government argues that the complex privilege review process, which entailed substantial

correspondence with the defendants and litigation, was the primary cause of the delay.  Although

the Court agrees that a privilege review process can reasonably delay the government's

completion of the scoping process, it is unpersuaded that the privilege review process is an

adequate explanation for the delay in this case.  The government's errors may not amount to bad

faith, but they demonstrate indifference and a lack of reasonable care.

In the cases involving privilege issues cited by the government, court-sanctioned delays

have fallen well short of four-and-a-half years.  In *United States v. Jarman*, for example, the

Fifth Circuit reviewed the seizure of several hard drives and computers from the residence of a

lawyer under investigation for receipt of child pornography.  847 F.3d at 263, 266–67.  The

government's off-site review of the seized devices took a total of twenty-three months.  *Id.* at

266.  The court held that the twenty-three-month review period was "reasonable under the

circumstances" because it was necessary to protect the attorney-client privilege and because it

fell "within the typical periods of delay in executing warrants" for computers.  *Id.* at 266–67; *see*

*also United States v. Wheat*, No. 1:17-cr-229, 2020 WL 13596203, at \*14 (N.D. Ga. May 28,

2020) ("[S]eventeen months to review more [than] twelve terabytes of data was not

unreasonable, especially when coupled with the complex privilege review that also took place."),

*report and recommendation adopted*, No. 1:17-CR-0229, 2022 WL 16851663 (N.D. Ga. Nov.

10, 2022).  Although the privilege review process was also necessary in this case to protect the

interests of Maresca and Themis Law's clients, the total period of the government's off-site

review well exceeds the twenty-three months at issue in *Jarman*.  Even more importantly, the

delay did not result from the difficulty of the task or resource limitations.  It resulted from

Examiner Harvin's apparent failure to comply with Agent Lawrence's request that he run the

date and relevance terms; from the government's failure to notice that omission for a period of years, while arguing in Court that the privilege review should occur before it was required to run these terms; and from Agent Lawrence's failure to recognize for a period of months that she had been granted access to only a small portion of the electronic media.

When asked why it waited so long to begin reviewing potentially privileged digital materials, the government cited an agreement between Maresca and the prosecution team that tolled the statute of limitations for the offenses under investigation between September 14, 2021, and December 14, 2021, and six interviews that it conducted in 2021.  Dkt. 237 at 115–16.  Counsel characterized the government as "little by little doing things to sort of understand the universe of privilege, to determine what was relevant, [and] what wasn't relevant with respect to the privilege."  *Id.*  At other times, the government has also pointed to the filter team's other responsibilities, which included the review of physical evidence seized during the May 2021 searches and other evidence obtained from the investigation into Themis Law.  *See* Dkt. 137 at 14–15; Dkt. 201 at 53.

As a threshold matter, government counsel's suggestion that the filter team needed two years to "understand the universe of privilege" and "what was relevant," Dkt. 237 at 116, before conducting *any* responsiveness or privilege review is difficult to take at face value.  That position is difficult to reconcile with the fact that Agent Lawrence gave Examiner Harvin a list of relevance and privilege search terms and requested that he run those terms on May 10, 2021, shortly after the warrants were executed in May 2021.  It is also difficult to reconcile with the government's initial position that Defendants, not the government, needed to take the first pass at reviewing all the seized digital data for privileged materials, *see* Dkt. 202-3 at 2; Dkt. 138-2 at 2–3; Dkt. 202-10 at 3–4; Dkt. 202-12 at 2; Dkt. 202-16 at 5–7—despite the fact that the Office

Warrant required the filter team to identify in the first instance relevant and potentially privileged documents and provide those documents to the applicable privilege holder for review, Dkt. 76-2 at 17.  Accordingly, the filter team did not itself begin reviewing any of the seized devices for privileged material until mid-2024, Dkt. 202 at 13; Dkt. 202-13 at 5, about a year after it nominally began the privilege review by asking two of the Defendants to take the first pass at a tiny subset of the seized files, Dkt. 202 at 10.  In light of the fact that the government had the capacity to begin the privilege review and scoping processes as early as May 10, 2021, and yet failed even to begin reviewing the seized devices until mid-2024, the Court is unpersuaded that the first two years of delay were reasonably necessary preparation for the privilege review process.

In any event, both the tolling agreement and the 2021 interviews are red herrings that do not explain, let alone justify the government's failure to begin the privilege review process for two years.  The parties entered the tolling agreement to "facilitate pre-trial disposition discussions" between the prosecution team and Maresca.  Dkt. 202 at 5.  The agreement waived Maresca's rights only as to "any statute of limitations defense" to the offenses then under consideration by the grand jury and "any constitutional claim based upon pre-indictment delay." Dkt. 202-1 at 3.  That waiver did not pertain to the search warrants at all or eliminate the government's Fourth Amendment duty to complete its off-site review of the seized devices in a reasonable amount of time.  Moreover, although the government asserted that "[t]he potential for a pre-trial resolution impacted the filter team's efforts," Dkt. 202 at 6, its own declaration indicates that the effect was almost *de minimis*.  It reports that the filter team temporarily ceased work on its review of the materials obtained during the May 2021 searches "[i]n or around December 11, 2021," just *three days* before the tolling agreement ended.  *Id.*  So, even assuming

that the tolling agreement permissibly informed the government's allocation of resources, by the government's own account, it had little effect on the filter team's timeline.

As for the six interviews conducted in 2021, the government characterized the purpose of those interviews as "determine[ing] whether call center scripts could be released to the Prosecution Team." Dkt. 137 at 15. The relevant call scripts are physical documents that were seized during the searches, so the steps taken by the filter team with regard to those documents were unrelated to the off-site review of the seized devices. Likewise, the filter team's efforts regarding other evidence obtained over the course of the investigation into Themis Law are largely irrelevant to the reasonableness of the government's warrant execution process. Where the "Fourth Amendment imposes a time-sensitive duty," the government "may not overlook this duty to attend to other matters for which the Constitution imposes no such time-sensitive duty unless there are important reasons why other matters must take priority." *Smith*, 967 F.3d at 210.

Even more to the point, although the government could not complete its off-site review of the seized devices until all privileged materials had been culled, it could have and, in fact, intended to begin the scoping process in 2021 by running relevance terms and date/time limitations on the seized devices before any privilege review took place. The government has taken that approach in other cases involving complex privilege review processes, *see Wheat*, 2020 WL 13596203, at *12–13, and it intended to do so here. Culling the initial collection has the benefit of identifying materials that are plainly unresponsive as soon as possible and narrowing the amount of non-responsive materials that are subject to privilege review and discovery. Although the Fourth Amendment does not dictate particular methods of execution, the record reveals that the government's failure to conduct an initial responsiveness review of the seized materials was a product of carelessness, and not the exercise of sound discretion.

Agent Lawrence's testimony at the last evidentiary hearing revealed that only four days after the devices were seized, the government had a list of relevance terms and privilege terms in hand and was capable of taking the first step to both scope the devices and to limit the amount of material subject to the privilege review. *See* Dkt. 232 at 39. Agent Lawrence, in fact, instructed Examiner Harvin to run those relevance terms and privilege terms on the seized devices to create "the only data set [the government] [would] be working with" from then on. *Id.* at 30; Def. Ex. 1 at 1 (Dec. 3, 2025, Hr'g). Agent Lawrence learned in June 2024, however, that despite this instruction, there is no indication that any member of the CART team ran "the initial relevance terms . . . against the data as requested." Dkt. 232 at 26, 35–36. Examiner Harvin never responded to the email, *id.* at 34, and Agent Lawrence never followed up to determine whether her May 10, 2021, request had been completed, *id.* at 36–38. When asked why she did not follow up on her May 10, 2021, request, Agent Lawrence testified that she "didn't know why [she] wasn't seeing" the results of her request. *Id.* at 38.

The prosecution team's failure to notice that no one had even started to conduct the first and critical layer of responsiveness review is not a reasonable justification for the more than three-and-a-half-year delay between the May 2021 searches and January 2025, when the prosecution team ran relevance terms and date/time limitations on the seized devices for the first time. Even then, moreover, the government's inattention continued, and Agent Lawrence did not notice for another nine months that she had run the relevance terms and date/time limitations on files that contained no PDFs, word documents, or emails, thus leaving the vast majority of the relevant material unscoped. This delay occurred simply because the filter team inadvertently failed to grant the prosecution team access to all non-privileged materials obtained from the nineteen devices that cleared the filter wall in January 2025, and Agent Lawrence failed to notice

67

that immense omission.  *Id.* at 27–28.  This later omission is all the more troubling because it

came to light only because the government was preparing for a factual hearing, which it argued

was unnecessary.  *See* Dkt. 216 at 4.  Indeed, it is unclear when—if ever—the government would

have properly scoped the devices had Maresca not pressed the point.[12]

As a result of this neglect, the government seized troves of irrelevant, personal

information and then left that information in the possession of law enforcement for years, not

because it lacked the resources to review the seized devices or faced technological obstacles, but

simply because it forgot.[13]  "The government's blatant disregard for its responsibility" to search

the seized devices for responsive materials so that non-responsive materials could be segregated

in a meaningful fashion "is unacceptable and unreasonable."  *Metter*, 860 F. Supp. 2d at 215

(finding that the government may not "seize and image electronic data and then retain that data"

for two years "with no plans whatsoever to *begin* review of that data to determine whether any

---

[12] The government argues that Maresca is responsible for at least some of the delay in its execution of the search warrants.  Dkt. 137 at 11.  It emphasizes, in particular, Maresca's approach to the privilege review process.  But to the extent that Maresca is responsible for delays in the actual privilege review process, those delays do not render the government's pre- and post-privilege-review delays reasonable.

[13] Adding insult to injury, because the government failed to perform an initial responsiveness review, it produced in discovery full forensic images of each of the seized devices—including the personal devices of Maresca and his family members—to every defendant.  Dkt. 202 at 12; Dkt. 138-2 at 2; *cf. Metter*, 860 F. Supp. 2d at 215 (explaining that the government's "intent to release indiscriminately the imaged evidence to *every* defendant, prior to conducting any review to determine if it contained evidence outside the scope of the warrants . . . compounds the assault on [the defendant's] privacy concerns").  When the government seizes non-responsive digital evidence, a reasonable approach to the retention of that material must respect the property owner's "compelling interest in controlling access to [his] material for his own private and professional purposes."  *Richman*, 350 F.R.D. at 419.  The government's release of the unscoped devices to every defendant unjustifiably interfered with Maresca's interest in excluding others from his personal information and that of his family.

irrelevant, personal information was improperly seized" (emphasis in original)); *cf. Smith*, 967 F.3d at 210–11 (delay in seeking search warrant unreasonable when "[t]he record [did] not show that there was any particular investigation or police duty that specifically delayed [the officer] in applying for a search warrant for the seized tablet"); *see also United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013) (Gorsuch, J.) ("What, after all, is 'reasonable' about police seizing an individual's property on the ground that it potentially contains relevant evidence and then simply neglecting for months or years to search that property to determine whether it really does hold relevant evidence needed for trial or is totally irrelevant to the investigation and should be returned to its rightful owner?").

For all of these reasons, the Court finds that the government has failed to conduct the off-site review of the seized devices in a reasonable manner in violation of Maresca's Fourth Amendment rights.

2.    *Remedy*

Having determined that the government's ongoing failure to complete its off-site review of the seized devices pursuant to the May 2021 warrants is unreasonable, the Court must decide what, if anything, to do about this ongoing violation of Maresca's Fourth Amendment rights. With respect to this violation, Maresca seeks only prospective relief in the form of an order barring the government from conducting any further searches of his devices. In his view, because "the government has taken an unreasonable [amount of] time to segregate non-responsive materials from the devices in violation of the Fourth Amendment, each additional search would create a new and continuing violation." Dkt. 154 at 4. And whether as an exercise of the Court's "inherent authority to regulate the government's review of seized materials, to promote fairness and [to] protect defendants' rights," *id.* at 3, or as an exercise of the Court's equitable authority to grant injunctive relief, *id.* at 5–6, Maresca continues, the Court should not

69

countenance such a future and ongoing violation of his constitutional rights, *id.* at 7.  Beyond recycling its efforts to justify its years-long delay in scoping the devices, Dkt. 158 at 11, which the Court has already rejected, the government argues that such a remedy "would not be a reasonable response to the problem the Court confronts" for at least two reasons. *Id.* at 6 (citation modified).  First, the government has an obligation to provide discovery to Maresca's co-defendants under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny and under Rule 16.  *Id.* at 12.  Second, "the Court should not use its inherent authority where there are other procedural and statutory avenues for the defendant to seek relief," including the suppression of any evidence found on the devices.  *Id.* at 7.

Consideration of the parties' respective positions requires the Court, once again, to differentiate between the devices at issue.  As explained above, Maresca lacks standing to object to the government's seizure and use of eight devices in full and portions of a ninth device.  As to those devices, no remedy is required.  That leaves the ten tablets and smartphones in one group, and the remaining ten computers (and a portion of an eleventh computer) subject to the new warrant in another.  The government contends that Maresca's motion for prospective relief is moot as to the computers but not as to the tablets and smartphones.  Dkt. 262 at 1.

Although the Court concludes that Maresca is not entitled to an order precluding the government from ever again searching any of the seized devices, it will enter an order prohibiting the government from accessing the ten tablets and smartphones unless and until it obtains a new, valid search warrant authorizing the seizure of those devices.  As to those ten tablets and smartphones, the government's ongoing seizure of the private data of Maresca and his family that is not responsive to the May 2021 warrant is unreasonable under the Fourth Amendment.  At this point, the government's only options are to "cease the seizure or secure a

70

new justification"—*i.e.*, a new warrant authorizing the seizure of the non-responsive material on those devices. *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017). However, because the government has already obtained a new warrant for the seizure of the remaining ten-and-a-half devices in which Maresca has protected privacy interests, there is nothing left for the Court to do as to those devices.

Although the Court agrees with Maresca that the government's delay in scoping the seized devices is both ongoing and unreasonable, the problem is not that any "additional search [of the seized devices] would create a new and continuing violation" of the Fourth Amendment. Dkt. 154 at 4. Rather, properly understood, Maresca's constitutional objection is limited to the government's unlawful *seizure* of non-responsive records, not its authority to *search* the seized devices. Indeed, in Maresca's opposition to the government's motion to deny his Fourth Amendment motions on mootness grounds, he argues that "the cases are clear that the constitutional harm is the government's wrongful retention"—*i.e.*, seizure—"of the [non-responsive] data for an extended time." Dkt. 258 at 4; *see id.* at 3. That is exactly right. As the Fourth Circuit and other district courts have recognized, when the government unreasonably delays its review of electronic media seized pursuant to a warrant, the Fourth Amendment violation is the seizure of non-responsive data for longer than reasonably necessary to serve the government's legitimate law enforcement interests. *See Zelaya-Veliz*, 94 F.4th at 338; *Metter*, 860 F. Supp. 2d at 212 (holding that the government's "delay in reviewing the seized electronic evidence . . . constitutes an unreasonable seizure under the Fourth Amendment"); *cf. Smith*, 967 F.3d at 205 (explaining that "a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant" (citation modified)).

Although the ongoing *seizure* of Maresca's non-responsive data violates the Fourth Amendment, that does not establish the essential premise of Maresca's argument for prospective relief: that all future *searches* of the seized devices would necessarily be unlawful.  Searches and seizures implicate different Fourth Amendment interests.  *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015).  While a search occurs when the government invades "an expectation of *privacy*," a seizure "occurs when there is some meaningful interference with an individual's *possessory* interests in that property."  *Id.* (emphasis in original) (quoting *Jacobsen*, 466 U.S. at 113); *accord Segura v. United States*, 468 U.S. 796, 806 (1984) ("A seizure affects only the person's possessory interests; a search affects a person's privacy interests.").  So, the reasonableness of a search, unlike a seizure, turns on the strength of a defendant's privacy interest and the government's justification for invading that interest.  *Cf. Wilkins*, 538 F. Supp. 3d at 93 n.12 (explaining that defendant's "diminished privacy interest" was not relevant to the constitutionality of a seizure of his phone).

The Fourth Amendment protects the privacy interest infringed by a search by requiring searches to be (1) executed pursuant to a valid warrant and (2) conducted in a manner that does not unreasonably infringe on a person's privacy interests.  *Heldt*, 668 F.2d at 1256–57; *see Matter of the Search of Twenty-Six (26) Digital Devices & Mobile Device Extractions*, No. 21-sw-233, 2022 WL 998896, at *11 n.4 (D.D.C. Mar. 14, 2022) ("bedrock Fourth Amendment caselaw establish[es] that satisfaction of the warrant requirement is generally enough to safeguard the constitutional guarantee of privacy"), *overruled on other grounds by Asinor*, 111 F.4th 1249.  Although a valid search warrant significantly reduces a defendant's privacy interest in records responsive to the warrant, *see Hudson*, 547 U.S. at 593; *Weaver*, 808 F.3d at 43, the government must still take care to execute the warrant in a manner reasonably calculated to

protect the defendant's considerably stronger privacy interest in non-responsive records, *see Heldt*, 668 F.2d at 1256–57; *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988).

Because Maresca has never argued that the May 2021 search warrant is insufficiently particular or unsupported by probable cause, he cannot contend that the government lacks sufficient justification for searching the devices for responsive records. *See Dalia*, 441 U.S. at 255. Nor has he given the Court reason to believe that the government is likely to search the seized devices in an unreasonable manner that infringes upon his privacy interests in non-responsive or privileged materials. Maresca's confidentiality interest in attorney-client privileged materials and attorney work product has been adequately protected through a lengthy privilege review process. Further, the government did not use either warrant as an opportunity to engage in a "general, exploratory rummaging in [Maresca's] belongings," *Metter*, 860 F. Supp. 2d at 212 (citation modified), and its unreasonable delay has not given it "any strategic advantage" in Maresca's case, *Smith*, 967 F.3d at 212. *Cf. Comprehensive Drug Testing, Inc.*, 621 F.3d at 1171 (extraordinary relief warranted where "[t]he government agents obviously were counting on the search to bring constitutionally protected data into the plain view of the investigating agents"). Nor, more generally, is there any evidence that the government has used the electronic material for any improper purpose; to the contrary, the concern is that the government did nothing with the material for a period of years.

Because any future *searches* of the seized devices would be conducted pursuant to a valid warrant, and there is no evidence that any such searches will be conducted in an unreasonable manner, an order enjoining any future searches is unnecessary to protect Maresca's privacy interest in the non-responsive records on the seized devices. That conclusion does not, however, spell the end of this saga. As the Court has explained, the government's *seizure* of non-

responsive data is ongoing and unreasonable. Although prohibiting the government from conducting any future searches would not constitute a fitting response to that violation, that does not leave Maresca without a remedy for the infringement of his possessory interests. Once a seizure becomes unlawful, the government has two options: it "must cease the seizure or secure a new justification." *Brewster*, 859 F.3d at 1197; *see also Asinor*, 111 F.4th at 1259.

Once again, different subsets of the materials at issue require different results.

a.        Computers Subject to the New Warrant

For the eleven computers in which Maresca has a cognizable privacy interest, the government has already "secure[d] a new justification," *id.*, in the form of a new warrant reauthorizing the seizure of the devices, including the non-responsive records contained therein. Maresca has not moved to quash that warrant and does not maintain that it is unsupported by probable cause or otherwise deficient. Instead, Maresca argues that the constitutional violation at issue here is not tied to the prolonged execution of the May 2021 warrants, but rather to "the government's prolonged possession of Mr. Maresca's private data." Dkt. 258 at 1. Although close, that is not quite right: Maresca identifies the correct constitution violation—the prolonged, unjustifiable seizure of his non-responsive data—but ignores the fact that this constitutional violation is inextricably linked to the government's delayed execution of the May 2021 search warrant.

As the D.C. Circuit recently explained, a seizure of a person's property "must be reasonable" "[a]t both the moment of seizure and throughout its duration." *Asinor*, 111 F.4th at 1258–59. Assessing the reasonableness of a seizure requires a case-by-case assessment that is, among other things, dependent upon the legitimacy of the government's interest in continuing to possess the property at issue. *See id.* at 1260–61; *Smith*, 967 F.3d at 205–06. When the government seizes evidence responsive to a valid warrant, it typically maintains a legitimate

interest in continuing to possess that evidence as long as reasonably necessary to complete the investigation and any related litigation. *Asinor*, 111 F.4th at 1261. But when it seizes non-responsive records, its legitimate interest in retaining meaningful access to those records lasts only as long as reasonably necessary to segregate those records and return them, if possible, or to maintain the integrity of any related evidence. Once a reasonable amount of time has passed, the warrant is no longer a sufficient justification for the retention of non-responsive records.

Here, the May 2021 search warrant initially provided sufficient justification for the seizure of Maresca's non-responsive data. But that justification lasted only as long as was reasonably necessary for the government to scope the seized devices. Having failed to scope the seized devices in a reasonable amount of time, the government can no longer rely on the May 2021 search warrant to justify its retention of those records. It must, instead, "cease the seizure or secure a new justification." *Brewster*, 859 F.3d at 1197. The January 2026 warrant offers that new justification. It reauthorized the government to seize the devices "containing the forensic images of specific digital devices (i.e., computers) recovered during search warrants executed on May 6, 2021," including the non-responsive records intermingled with responsive records on those devices. Search and Seizure Warrant at 4, *United States v. Two Hard Drives Containing Digital Device Forensic Images, Located in Washington, D.C., Under Rule 41*, No. 26-sw-02 (D.D.C. Jan. 8, 2026), ECF No. 2. That new warrant is sufficient to justify the government's possession of those records at this point in the process.

Maresca suggests that allowing the government to seek a new warrant would "gut . . . Fourth Amendment protection" for unreasonable delay violations. Dkt. 258 at 4. But allowing the government to obtain a new warrant does not immunize it from the consequences of a Fourth Amendment violation in general, or an unreasonable delay violation, in particular. The

75

exclusionary rule is still the primary sanction for any past Fourth Amendment violation, and in this case, the Court found a violation and ordered the suppression of any evidence traceable to that violation. In fact, the Court has denied the government's mootness motion as to Maresca's motion to suppress precisely because the new warrant did not cure the unreasonable delay violation. Once the government obtained a new warrant reauthorizing its seizure of the non-responsive records on the computers, however, the Fourth Amendment violation ended. Although the Court may exercise its inherent authority to prevent future violations of Maresca's Fourth Amendment rights, and although the exclusionary rule operates to deter future violations more broadly, the Court can discern no basis to grant prospective injunctive relief in the absence of an ongoing violation or the need to deter future violations. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1363 (D.C. Cir. 2023) ("The purpose of an injunction is to prevent future violations" (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

It bears emphasis that Maresca's requested remedy is extraordinary—both because it is injunctive in nature and, as far as the Court can discern, unprecedented. Maresca has failed to identify a single case in which any court has prohibited the government from seeking a new warrant for evidence in circumstances anything like those presented here. To the contrary, the ordinary rule is that the government may seek a successive warrant after a Fourth Amendment violation. Even in *Richman v. United States*—where the government's conduct was significantly more egregious than in this case—Judge Kollar-Kotelly declined to prohibit the government from "using or relying on those [illegally possessed] materials in a separate investigation or proceeding, *as long as they are obtained through a valid warrant and judicial order*." 350 F.R.D. at 423 (emphasis added) (citation modified). Although *Richman* addressed "the use of

76

evidence in a future criminal prosecution of [a] person other than [the petitioner]," *id.*, it is instructive for two reasons.  First, the court observed that it was "doubtful" that it "would have equitable jurisdiction to enter such an order."  *Id.*  That skepticism is warranted given the dearth of caselaw supporting such a remedy.  But second, here, the government does not merely seek access to the material at issue to assist with its investigation of Maresca, but also to aid in its investigation of Marinelli and Babbs.  Accordingly, the Court's discussion of the Supreme Court and D.C. Circuit caselaw prohibiting the use of the supervisory power and the exclusionary rule to bar the introduction of evidence against a party who was not the victim of the challenged practices, *id.*, is also relevant to this case.[14]

  For those reasons, the Court will grant the government's mootness motion as to Maresca's request for prospective relief for the eleven devices that Maresca has standing to challenge and that are covered by the January 2026 search warrant.  The Court's suppression ruling for these devices—a ruling that holds the government to its self-imposed commitment and that gives meaning to the timely scoping requirement—is sufficient to incentivize law enforcement to avoid similar lapses in its off-site review of seized electronic devices in the future.

  b.  Tablets and Smartphones Not Subject to New Warrant

  The government, however, lacks any new justification for its continued possession of the non-responsive records on the ten tablets and smartphones not covered by the January 2026

---

[14] The Court is also unpersuaded that the validity of the new warrant turns on whether the forensic images remain in the government's control or whether it returns those images to Maresca pursuant to Rule 41(g), and the government then appears at his home or office to execute a new warrant and to re-seize the material.  Indeed, if anything, that process would be more intrusive, and it would raise unnecessary questions regarding chain of custody and the integrity of any evidence.

77

warrant.  Presumably, these tablets and smartphones—most of which were discovered in Maresca's home and some of which belong to his family—contain a trove of personal information about Maresca and his family.  Maresca has a strong possessory interest in these devices and especially in "exercising the right to exclude by deciding who [may] and [may] not access" the non-responsive data stored on them.  *Id.* at 416 (citation modified); *see also United States v. Hubbard*, 650 F.2d 293, 302–03 (D.C. Cir. 1980).  After four-and-a-half years and counting, the May 2021 warrant no longer supports the government's retention of the personal text messages, photographs, emails, notes, and other data stored on those devices.  Permitting the government to continue to exercise practical control over the unscoped forensic images of the tablets and smartphones would sanction an unreasonable seizure of (at least) the non-responsive material on those devices.

According to the government, an order directing it to eliminate its access to that non-responsive material is unnecessary in light of Maresca's other remedies, including a motion to suppress or a Rule 41(g) motion for the return of property.  Dkt. 158 at 7.  But as Maresca correctly observes, suppression is typically understood as a deterrent based on past, unlawful conduct—not as a license to violate a defendant's Fourth Amendment rights in the future.  Nor is the Court persuaded that Rule 41(g)'s procedure for the return of property, *see* Fed. R. Crim. P. 41(g), prevents the Court from simply precluding the government from accessing the devices. *See, e.g.*, *Cawthorn*, 682 F. Supp. 3d at 461 (finding an unreasonable delay violation and ordering that the government "shall not meaningfully retain access to the Instagram data beyond what it has already identified as responsive" (capitalization normalized)).  In fact, requiring the government to seal the devices and their forensic images comports with Rule 41(g), which authorizes courts granting motions for the return of property to "impose reasonable conditions to

78

protect access to the property and its use in later proceedings." Fed. R. Crim. P. 41(g). An order sealing the tablets and smartphones protects the government's interest in ensuring that any relevant material on the devices is properly preserved and is less burdensome than simply requiring the return of those devices. To the extent that such an order temporarily eliminates the government's access to responsive materials stored on the tablets and smartphones, that is the avoidable consequence of the government's failure to scope the seized devices in a reasonable amount of time.

The government's invocation of its duty to the other defendants under Rules 5 and 16 is equally unavailing with respect to the ten tablets and smartphones. Although their position is less clear with respect to the additional devices covered by the new warrant, both Marinelli and Babbs have expressly waived their rights "to assert claims pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny . . . with respect to the devices within the scope of the Court's order," if any, barring the government from accessing the devices. Dkt. 238 at 1; *accord* Dkt. 237 at 119. Indeed, even after the government obtained the new warrant and accessed some of the devices, both Marinelli and Babbs reaffirmed that their "previously-filed [c]onditional [w]aiver[s] still appl[y] with respect to the ten mobile devices that are not covered by the January 8, 2026 search warrant." Dkt. 254 at 3; *accord* Dkt. 256 at 1 ("As previously stated at prior hearing held in this matter Mr. Babbs waives any *Brady* claim with respect to these devices in possession of the government but, upon information and belief, have not been scoped, i.e. searched."). Statements and material covered by Rule 16(a)(1)(B) & (E), moreover, are discoverable only upon request of the defense—which could trigger reconsideration of this decision—and, more importantly, only if "within the government's possession, custody, or control"—which the Court's decision precludes, at least for now.

79

## CONCLUSION

For the foregoing reasons, Maresca's motion to suppress, Dkt. 133, is **GRANTED** in part and **DENIED** in part; Maresca's motion for order to prevent continuing Fourth Amendment violations, Dkt. 154, is hereby **GRANTED** in part, **DENIED** in part as moot, and **DENIED** in part; and the government's motion to deny Maresca's Fourth Amendment motions in part, Dkt. 243, is **GRANTED** in part and **DENIED** in part.  It is further **ORDERED** that the government shall place the ten tablets and smartphones not covered by the January 2026 warrant in a sealed container and shall not access that container absent further order of the Court.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 6, 2026